[No. B021687. Second Dist., Div. Five. May 15, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ROMAN CAMACHO MARTINEZ, Defendant and Appellant.

1374

COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Suzan E. Hier, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, William R. Weisman and Joan Comparet, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

FEINERMAN, P. J.—Defendant, Roman Camacho Martinez, was convicted by jury of one count of second degree murder (Pen. Code, § 187) and one count of assault by means of force likely to produce great bodily injury and with a deadly weapon (Pen. Code, § 245, subd. (a)(1)). An allegation that defendant had personally used a knife in commission of the murder was found to be true. (Pen. Code, § 12022, subd. (b).)

The court denied defendant's motion for a new trial and he was referred to the California Youth Authority for diagnostic study pursuant to Welfare and Institutions Code section 707.2. Probation was thereafter denied and defendant was sentenced to state prison for a period of 15 years to life for the murder, plus 1 year for the use allegation. He was also sentenced to the concurrent high term of four years on the assault. Pursuant to Welfare and Institutions Code section 1731.5, the defendant was ordered housed at the California Youth Authority. Defendant was credited with 745 days in custody, including 248 days good time/work time.

Defendant contends that the court erred in failing to give certain jury instructions, that there was prosecutorial misconduct and that the trial court abused its discretion in sentencing him to state prison. We affirm the judgment.

BACKGROUND

On the evening of November 14, 1984, Rosemary Villapondo (Villapondo) witnessed a fight between someone named Louie and a group of

people, including the defendant. Villapondo talked to Louie and then went to a phone booth to call her mother. While trying to make the call, defendant approached her from behind and started to take the phone from her. He accused her of trying to call her friends, and put a knife behind her neck.

Villapondo started to walk away from the telephone as her fiance, John Ruiz (Ruiz), approached. When Villapondo told Ruiz what had happened, he confronted the defendant who immediately stabbed Ruiz in the heart.[1] Ruiz was unarmed and had made no striking motions toward the defendant.

After Ruiz fell to the ground, defendant and his companions started to beat and kick him. Ruiz tried to leave, but fell once more and was again assailed. Alberto Hidalgo (Hidalgo) had seen the stabbing and struck the defendant in the head with a stick.[2]

After his assailants ran off, Ruiz went to a local market and collapsed. He died of his stab wound.

Sometime later, police went to the defendant's home. A uniformed officer identified himself to the defendant who was looking out a window. Defendant turned and ran towards the back of the house. When the police located him, the defendant was hiding under some blankets in an upstairs bedroom closet. Police arrested him.

In his defense, the defendant put on a witness, Rosalinda Delgadillo (Delgadillo) who testified that she had seen several people in a fight on the night Ruiz was murdered. She did not see the stabbing, but she heard an acquaintance named Solomon Hidalgo tell the others to run—that he had nailed or finished off Ruiz.[3] Delgadillo testified that defendant was lying on the ground while Solomon Hidalgo and the others were fighting.

---

[1] During trial, Villapondo identified defendant as the man who had stabbed her fiance. She testified that she had not identified him during the preliminary hearing because her life had been threatened. She also could not identify the defendant from a photo display before the preliminary hearing.

[2] Hidalgo twice identified the defendant from a photo spread before the preliminary hearing. On the first occasion, he was shown a one and a half-year-old photo of the defendant. He said that this picture of the defendant looked like the man who had stabbed Ruiz. When shown a current picture of the defendant about one and a half weeks later, Hidalgo positively identified the defendant. He recognized two other people from the later photo display, one of whom he said helped beat the victim and the other of whom he said was not present at the fight. During the preliminary hearing, Hidalgo said that it was dark when he saw someone who looked like the defendant jab or stab the victim, but that he could not be certain of his identification. At trial, Hidalgo indicated that he saw a knife in the defendant's hand and saw him make a stabbing motion at Ruiz. He did not "exactly" see the knife contact Ruiz's body. However, he also testified that the person whom he had hit with a stick, the defendant, was the person who had stabbed Ruiz.

[3] Delgadillo used a Spanish interpreter during testimony. Delgadillo used the verb "clavar" in recalling what she had heard Solomon Hidalgo say. During an Evidence Code section 402 hearing and during testimony of the intepreter at trial, the interpreter explained that the word "clavar" had a number of possible meanings. These included to stab, to stick, to pin or pin down, to hammer, to hit, to nail, or to finish somebody off.

DISCUSSION

I

Defendant contends that the trial court erred in refusing to give three of his requested jury instructions on eyewitness testimony. He argues that he was entitled to instructions which related identification to reasonable doubt and that the court had a duty to modify any objectionable parts of his proposed instructions and to give the instructions, as modified. In particular, defendant argues that the court erred in refusing to give his fifth, seventh and ninth specially requested jury instructions.[4]

### A. *Fifth Requested Jury Instruction*[5]

■ Defendant's fifth requested instruction addresses the People's burden of proving beyond a reasonable doubt that he committed the crimes charged. The defendant essentially concedes, and we agree, that the first paragraph of the requested instruction was adequately covered in another jury instruction given by the trial court (CALJIC No. 2.91). He insists, however, that the instructions received by the jury did not substantively address the second paragraph of his requested instruction. That paragraph instructs jurors that the defendant need not prove that someone else committed the crimes charged and that reasonable doubt as to the perpetrator's identity must result in the defendant's acquittal.[6]

Defendant's contention is meritless. As given by the trial court, CALJIC No. 2.90 clearly states that a defendant "is presumed innocent until the

---

[4]In his reply brief, defendant states that the recently decided case of *People* v. *Wright* (Cal.) is controlling on the issue of his fifth requested instruction. Following *Wright,* defendant indicates that failure to give this instruction was "harmless error in light of the standard instructions given . . . ." We note, however, that the Supreme Court granted a rehearing on *Wright* on March 26, 1987 (Crim. 24087), and we therefore review his fifth requested jury instruction on appeal.

[5]Defendant's fifth requested jury instruction read as follows: "You are instructed that the identity of the defendant as the person who committed the crime is an element of every offense. Therefore, the burden is on the state to prove beyond a reasonable doubt not only that the crime alleged was committed, but also that the defendant was the one who committed it. You must be satisfied beyond a reasonable doubt of the accuracy of the witness' identification of the defendant before you may convict him of the offense charged against him.

"In this regard, you are instructed that it is not necessary for the defendant to prove that another person may have committed the crime, nor is it the burden of the defendant to prove his innocence. If facts and circumstances have been introduced into evidence which raise a reasonable doubt as to whether the defendant was the person who committed the crime charged, then you must find the defendant not guilty of the offense."

[6]The second paragraph of the defendant's requested jury instruction is taken verbatim from a jury instruction which the trial court erroneously refused to give in *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 387, footnote 1 [121 Cal.Rptr. 69].

contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty." This instruction further emphasizes that the presumption of innocence "places upon the State the burden of proving [the defendant] guilty beyond a reasonable doubt." Thus, the court effectively cautioned the jury that the People must prove the defendant's guilt rather than the defendant's having to prove his innocence or the guilt of another. Therefore, the second paragraph of defendant's requested instruction was repetitious of an instruction already given, and was properly refused by the trial court. (*People* v. *McCowan* (1978) 85 Cal.App.3d 675, 679-680 [149 Cal.Rptr. 611].)

### B. *Seventh Requested Jury Instruction*[7]

 Defendant's seventh requested instruction advises the jury to evaluate identification testimony with respect to the witnesses' opportunity to observe, any prior inconsistent identifications or failed prior attempts to identify and the certainty of identification after cross-examination. In light of these factors, the instruction concludes by admonishing that testimony which suggests weaknesses in identification should be viewed with caution and scrutinized with care. Defendant complains that although the "factors listed in this instruction [were] alluded to in other instructions given, they [were] not specifically stated." He also insists that no other instruction included the cautionary last sentence. He urges that such a cautionary statement was especially appropriate because there were prior inconsistent identifications and/or prior failures to identify the defendant.

In reviewing the requested jury instruction, we find that each of the substantive factors listed for jury consideration was adequately addressed in one or more of the jury instructions actually given by the court:[8]

### 1. *Opportunity to Observe*

CALJIC No. 2.92 reads in pertinent part that, "In determining the weight to be given eyewitness identification testimony, you should consider ... factors which bear upon the accuracy of the witness' identification of the defendant, including, but not limited to ... [¶] [t]he opportunity of the

---

[7]Defendant's seventh requested jury instruction read as follows: "In evaluating the identification testimony of a witness, you should determine: [[¶] (1) If the witness utilized any opportunity he had to make an adequate observation; (2) If the witness' identification testimony is not weakened by a prior failure to identify or by a prior inconsistent identification; and, (3) If after cross-examination the testimony remains positive and unqualified. [¶] If you find that any of these conditions is absent, you are admonished to consider the witness' testimony as to identity with caution and scrutinize it with care."

[8]The trial court gave the following jury instructions in their entirety: CALJIC Nos. 2.92, 2.20, 2.13, 2.21 and 2.22.

witness to observe the alleged criminal act and the perpetrator of the act . . . ." CALJIC No. 2.20 also provides in relevant part that "[i]n determining the believability of a witness you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness, including but not limited to . . . [¶] [t]he extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness has testified . . . ."

### 2. *Prior Failures to Identify and/or Prior Inconsistent Identifications*

CALJIC No. 2.20 provides in pertinent part that in evaluating the credibility of witnesses and the weight to be given each witness's testimony, jurors may consider "[a] statement previously made by the witness that is [consistent] [or] [inconsistent] with the testimony of the witness . . . ." More expansively, CALJIC No. 2.13 provides that prior inconsistent statement "may be considered . . . not only . . . [to test] the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on . . . former occasion[s]." Finally, CALJIC No. 2.21 cautioned that "[a] witness willfully false in one material part of his testimony is to be distrusted in others . . . . [¶] . . . Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance."

### 3. *Certainty of Identification After Cross-examination*

CALJIC No. 2.91 reviews the People's burden of proving identity based solely on eyewitnesses. It provides that "[t]he burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. [¶] If, after considering the circumstances of the identification [and any other evidence in this case], you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty." In this regard, CALJIC No. 2.92 lists those factors which should be considered in proving identity by eyewitness testimony. As noted above, CALJIC No. 2.20 further instructs jurors that they are the sole judges of the believability of a witness and the weight to be afforded witness testimony. CALJIC No. 2.22 and 2.13 also admonish the jury to weigh the convincing force of conflicting testimony and to carefully evaluate prior inconsistent statements.

In sum, defendant's requested jury instructions were largely duplicative of the instructions given by the court. However, none of the court's instructions cover the concluding admonition in the defendant's seventh requested instruction. That admonition read as follows: "If you find that any of these

conditions is absent, you are admonished to consider the witness' testimony as to identity with caution and scrutinize it with care."[9]

A cautionary charge does not, of course, pose a rule of substantive law. Rather, it is subsumed by the general supervisory powers of the trial court to assure that jurors understand and properly discharge their duties. The premise for giving such an instruction on identification testimony is that eyewitness identifications are often unreliable. (*People* v. *Cardenas* (1982) 31 Cal.3d 897, 908 [184 Cal.Rptr. 165, 647 P.2d 569].)

Assuming, arguendo, that the trial court erred in refusing to specifically advise that identification testimony is to be viewed "with caution," we do not find the error prejudicial. Here, the eyewitness evidence was somewhat mixed. On the one hand, the testimony was unrefuted that defendant was present at the scene of the crime. The defendant's only witness put him there. So, too, soon after the incident, Alberto Hidalgo identified defendant from photo displays. On the other hand, Villapondo did not identify defendant from a photo display and neither she nor Hidalgo could or would identify the defendant during the preliminary hearing.

During trial, People's eyewitnesses were thoroughly cross-examined on prior weaknesses in their ability to identify the defendant. The jury was also specifically instructed on prior inconsistent or inconsistent statements as evidence (CALJIC Nos. 2.13, 2.20) and on the need to view with distrust testimony which was willfully false in any material part (CALJIC No. 2.21). They were further instructed that in determining the believability of witnesses, they could consider anything which had a tendency in reason to prove or disprove the truthfulness of the testimony, including the witnesses' opportunity to observe and recall matters upon which they were testifying (CALJIC No. 2.20). Thus, because some uncertainty existed as to the eyewitnesses' respective identifications of the defendant, the trial court gave jury instructions which particularly focused the jury's attention on this weakness in the People's case. To find the defendant guilty beyond a reasonable doubt the jury, in following the court's instructions, had to have carefully weighed and considered the credibility of Villapondo's and Hidalgo's eyewitness identifications.

We have no reason to believe that the jury failed properly to discharge its duty in this regard or that a result more favorable to the defendant would

---

[9]This statement does not clearly follow from the second part of defendant's requested instruction, which asked the jurors to determine, "[i]f the witness' identification testimony is not weakened by a prior failure to identify or by a prior inconsistent identification . . . ." Nevertheless, the gist of defendant's closing admonition is clear—that eyewitness testimony is to be reviewed with caution and care.

have been reached if the trial court had also given that part of the requested jury instruction which advised that identification testimony should be considered with caution and scrutinized with care. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

C. *Ninth Requested Jury Instruction*[10]

■ Defendants' ninth requested jury instruction is patterned after one delineated in *People* v. *Guzman, supra,* 47 Cal.App.3d 380, 386-387, footnote 1, questioned on other grounds in *People* v. *Brown* (1985) 40 Cal.3d 512, 526 [230 Cal.Rptr. 834, 726 P.2d 516] (see appen. I). Although the jury instruction proffered in *Guzman* was long and argumentative, the court in *Guzman* stated that a modified version of such a jury instruction should be given upon request because a defendant is entitled to an instruction relating the circumstances surrounding eyewitness identification to reasonable doubt.

---

[10]Defendant's ninth requested jury instruction read as follows: "Identification testimony is an expression of belief or impression by the witness. Its value depends on the witness' observation of the offender at the time of the offense and his ability to make a reliable identification later.

"In appraising the identification testimony of a witness, you should consider the following:

"(1) Are you convinced that the witness had the capacity and adequate opportunity to observe the offender?

"Whether the witness had adequate opportunity to observe the offender at the time of the offense will be affected by such matters as his concentration at the time, as the length of time available to the witness, and whether that time period was interrupted by conscious or unconscionable [*sic*] events causing distraction of the witness, the lighting conditions at the time of the claimed observations and whether the witness had occasion to see or know the person in the past.

"(2) Are you satisfied that the identification made by the witness subsequent to the offense was the product of his own recollection? You may take into account the strength of the identification and the circumstances under which the identification was made.

"If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him for identification, you should scrutinize the identification with great care. You may consider also the length of time that lapsed between the occurrence of the crime and the next opportunity of the witness to see the defendant, as a factor bearing on the reliability of the identification.

"You may also take into account that an identification [made by] picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.

"(3) You may take into account any occasions in which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with his identification at trial.

"(4) Finally, you must consider the credibility of the identification witness in the same way as any other witness, consider whether he is truthful, and consider whether he had the capacity to make a reliable observation on the matter covered in his testimony.

"I again emphasize that the burden of proof on the prosecutor extends to every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged. If after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty."

Here, the trial court specifically considered defendant's request for a *Guzman*-like instruction and stated that "[i]t's the court's feeling that the factors and criteria set forth in [the requested] instructions have been sufficiently incorporated in CALJIC No. 2.92, the 1984 revision. And it's the court's intention not to give the proposed instructions."[11] In light of this ruling, the court then asked defense counsel if there were additional factors listed in the requested instructions that he wished to add to CALJIC No. 2.92. Defense counsel said, "No, your honor."

CALJIC No. 2.92 instructs jurors that in assessing identification testimony, they should weigh not only the credibility of eyewitnesses but factors which affect the accuracy of such an identification. The jury instruction then delineates a long list of those factors, many of which duplicate those listed in defendant's own requested instruction.[12] Defendant now complains that CALJIC No. 2.92 was not thorough enough because it failed to address the following: (1) the witness's concentration on the offender and causes for distraction at the time of the offense as well as attendant lighting conditions; (2) the strength of the identification and the circumstances under which the identification was made; (3) the need to scrutinize an identification with great care when the identification may have been affected by "the circumstances under which the defendant was presented to him"; and (4), prior occasions when a witness failed to make an identification.

We are unpersuaded that the court's failure to include such factors constituted error. First, as defendant himself concedes, the jury instruction prof-

---

[11]In making its determination, the court not only reviewed *People* v. *Guzman, supra,* 47 Cal.App.3d 380, but two other authorities cited by the defendant. They were *People* v. *Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826] and *People* v. *Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847].

[12]As given by the court, CALJIC No. 2.92 read as follows: "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crime[s] charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness' identification of the defendant, including, but not limited to, any of the following: [¶] [The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act;] [¶] [The stress, if any, to which the witness was subjected at the time of the observation;] [¶] [The witness' ability, following the observation, to provide a description of the perpetrator of the act;] [¶] [The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness;] [¶] [The cross-racial or ethnic nature of the identification;] [¶ [The witness' capacity to make an identification;] [¶] [Evidence relating to the witness' ability to identify other alleged perpetrators of the criminal act;] [¶] [Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup;] [¶] [The period of time between the alleged criminal act and the witness' identification;] [¶] [Whether the witness had prior contacts with the alleged perpetrator;] [¶] [The extent to which the witness is either certain or uncertain of the identifcation;] [¶] [Whether the witness' identification is in fact the product of his own recollection;] [¶] [ _____.] [¶] Any other evidence relating to the witness' ability to make an identification."

fered in *Guzman* was not a model instruction. Therefore, the court was under no duty to give the *Guzman* instruction, per se. The concern of the court in *Guzman* was that the trial court instruct on the "factors that affect eyewitness identification testimony, as they relate to reasonable doubt." (*People v. Guzman, supra,* 47 Cal.App.3d at p. 386.) CALJIC No. 2.92 clearly focused the jury's attention on such factors.

Second, although defendant's requested instruction included factors not addressed by CALJIC No. 2.92, the trial court afforded defense counsel an opportunity to augment that instruction with additional factors. Defense counsel declined. It is clearly not the job of the court to detail every factor which may affect the accuracy of eyewitness identifications in a particular case. Given the fact that defense counsel chose to accede to the instruction offered by the court rather than to amend it, defendant cannot now complain that CALJIC No. 2.92 is not specific enough to properly instruct the jury. (See *People* v. *Jackson* (1985) 164 Cal.App.3d 224, 240 [210 Cal.Rptr. 680].)

## II

■ Defendant next contends that the prosecutor committed prosecutorial misconduct in closing argument. He alleges that the prosecutor not only used evidence to inflame the jurors but that he improperly referred to factors not in evidence and to other highly publicized crimes. Defendant raises these objections for the first time on appeal.

■ In all cases where a defendant complains of prosecutorial misconduct for the first time on appeal, the threshold question is whether a "timely objection and admonition would have cured the harm." (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468], disapproved of on other grounds in *People* v. *Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].) Only if it would not, does the reviewing court reach the issue of whether such misconduct caused a miscarriage of justice.

■ Here, defendant's first assignment of error relates to the prosecutor's use of a photograph of the victim at the beginning of closing argument. In referring to the exhibit, the prosecutor said that it was "not a pretty sight. It's not intended to be a pretty sight. It's intended to remind each and every one of us that one person [the victim] never got to testify."

The picture to which defendant objects was first used during trial when shown to the victim's fiancee for identification. The photograph was later admitted into evidence without objection. Thus, defendant had an opportunity to object to the introduction of this picture as an exhibit well before closing argument. Clearly, had a timely objection been made to the use of

this picture, the court could have ruled on the proffered evidence and avoided any potential harm, if any. Further, we do not find that the prosecutor's comments on the photograph added significantly to the impact of the photo itself.

■ Defendant's next claim of error deals with comments which the prosecutor made in an attempt to explain why Villapondo had failed to identify the defendant before trial. At trial, Villapondo testified that she had been afraid to identify the defendant because her life had been threatened. Defendant argues that the prosecutor went beyond Villapondo's testimony in this regard when he argued as follows: "It's very easy to picture what happen[ed]. She told the police somebody called me up and [threatened me]. What did the police say? Well, if something else happens, call us. That was real reassuring I'm sure. [¶] There isn't anything they can do." In fact, no evidence was presented as to what the police had told Villapondo in response to her report of the threat.

■ Despite the fact that the prosecutor's comments were outside the record, case law provides that counsel "during summation may state matters not in evidence." (*People* v. *Sassounian* (1986) 182 Cal.App.3d 361, 396 [226 Cal.Rptr. 880].) This right is very broad and affords the prosecutor an opportunity to state his views as to what the evidence shows and the conclusions which may be drawn therefrom. (*Ibid.*) ■ Here, Villapondo told police about having been threatened before the preliminary hearing. Obviously, she still felt threatened at the time of the preliminary hearing when she refused to identify the defendant for fear of her life. In this context, the prosecutor could logically have inferred and reasonably have argued to the jurors that whatever reassurances the police had given her before the preliminary hearing were not enough.

■ The defendant's next allegation of prosecutorial misconduct also involves the prosecutor's explanation of why Villapondo lied at the preliminary hearing about the defendant's identity. The prosecutor argued, "I'm sure each and every one of you several months ago heard about a Los Angeles police officer who was picking up his child and was gunned down [on] the street because he testified. [¶] Do you think facts like that went through Ms. Villapondo's mind? It's a reality, ladies and gentlemen. The criminals of this world, the criminals of this state, the criminals of this city, think they're going to run our lives. They think they can terrify witnesses into not showing up and they walk out the door free."

■ As noted above, counsel is not restricted to commenting on matters in evidence. (*People* v. *Soussounian, supra,* 182 Cal.App.3d at p. 396.) He is free to address subjects which are common knowledge or which are

"illustrations drawn from common experience, history or literature." (*Ibid.*)
 In the instant case, the prosecutor's reference to witness intimidation was not without basis in the record. Villapondo testified she had been threatened with death. That such a witness would feel intimidated by thoughts of reprisal is a matter of common knowledge and experience. Moreover, had defense counsel made a timely objection to the prosecutor's editorializing, the jurors could effectively have been admonished to disregard his reference to other instances of witness intimidation.

Finally, defendant maintains that the evidence of threats presented at trial was never directly linked to the defendant and that its use at trial was limited to the effect any threat may have had on Villapondo's testimony. Defense counsel argues, therefore, that "the prosecutor's sweeping condemnation of criminals who terrorize witness' [*sic*] against them in hopes of going free was an improper use of this evidence against [the defendant]."

Again, we find that any objection to the prosecutor's comments in this regard should have been raised before the trial court, where the alleged harm could have been cured by a timely admonition.

### III

 Finally, the defendant contends that the trial court abused its discretion in sentencing him to state prison. Specifically, he argues that the court failed to give sufficient weight to the California Youth Authority's recommendation that he be sent to the Youth Authority.

The decisional law upon which defendant primarily relies for this argument is found in the Supreme Court cases of *People* v. *Javier A.* (1985) 38 Cal.3d 811 [215 Cal.Rptr. 242, 700 P.2d 1244] (*Javier A.*) and *People* v. *Carl B.* (1979) 24 Cal.3d 212 [155 Cal.Rptr. 189, 594 P.2d 14] (*Carl B.*). In interpreting Welfare and Institutions Code section 707.2, these two cases stated that although the recommendation of the California Youth Authority (CYA) that a minor be committed to their facilities was not absolutely binding on a trial court, such a recommendation was entitled to "great weight" (*Javier A., supra,* 38 Cal.3d at p. 820; *Carl B., supra,* 24 Cal.3d at p. 214) and should be followed "[absent] substantial countervailing considerations." (*Carl B., supra,* 24 Cal.3d at pp. 214-215.)

Both *Carl B.* and *Javier A.* involved offenses which were committed before the 1982 amendment to section 707.2.[13] Upon revision in 1982, the Legisla-

---

[13]When *Carl B.* and *Javier A.* were decided, they applied the following version of Welfare and Institutions Code section 707.2: "Prior to sentence, the court of criminal jurisdiction may

ture specifically addressed the issue of whether the adult court is authorized to sentence a minor to state prison regardless of any finding in the CYA evaluation and report.[14] In so doing, it incorporated the following paragraph into section 707.2: "The need to protect society, the nature and seriousness of the offense, the interests of justice, the suitability of the minor to the training and treatment offered by the Youth Authority, and the needs of the minor shall be the primary considerations in the court's determination of the appropriate disposition for the minor."

██ A review of the legislative history surrounding passage of this amended version of section 707.2 clearly indicates that the sentencing discretion of the trial court was to be enlarged beyond that contemplated by the Supreme Court in *Carl B.* Illustratively, when section 707.2 was reconsidered by the Senate Judiciary Committee, that committee espoused the purpose for change as follows: "Under existing law a criminal court may not sentence a minor to state prison unless [the minor] has first been remanded to the Youth Authority for an evaluation concerning [the minor's] amenability to YA training and treatment and the judge has found, after considering the YA report, that the minor is not a suitable subject for YA commitment.

"This bill would remove the requirement that the judge find that the minor is unsuitable and would instead specify that, regardless of the YA report, the judge could sentence the minor to state prison after having considered specified sentencing objectives.

remand the minor to the custody of the California Youth Authority for not to exceed 90 days for the purpose of evaluation and report concerning his amenability to training and treatment offered by the Youth Authority. No minor who was under the age of 18 years when he committed any criminal offense and who has been found not a fit and proper subject to be dealt with under the juvenile court law shall be sentenced to the state prison unless he has first been remanded to the custody of the California Youth Authority for evaluation and report pursuant to this section and the court finds after having read and considered the report submitted by the Youth Authority that the minor is not a suitable subject for commitment to the Youth Authority."

· [14]As amended, Welfare and Institutions Code section 707.2 reads as follows: "Prior to sentence, the court of criminal jurisdiction may remand the minor to the custody of the Youth Authority for not to exceed 90 days for the purpose of evaluation and report concerning his amenability to training and treatment offered by the Youth Authority. No minor who was under the age of 18 years when he committed any criminal offense and who has been found not a fit and proper subject to be dealt with under the juvenile court law shall be sentenced to the state prison unless he has first been remanded to the custody of the Youth Authority for evaluation and report pursuant to this section.

"The need to protect society, the nature and seriousness of the offense, the interests of justice, the suitability of the minor to the training and treatment offered by the Youth Authority, and the needs of the minor shall be the primary considerations in the court's determination of the appropriate disposition for the minor."

"The purpose of this bill is to permit minors who are tried in adult court to be sent to state prison *regardless of the Youth Authority evaluation.*" (Italics added.) (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3190 (1981-1982 Reg. Sess.).)

The judiciary committee's report went on to comment that the proposed change was in response to the holding in *Carl B.* that "if the YA recommends that a minor be committed to its jurisdiction, the court must give great weight to that recommendation absent substantial countervailing considerations." (*Ibid.*) As amended, therefore, section 707.2 only requires that the trial court consider a CYA amenability recommendation as one of "several primary considerations in the court's determination of the appropriate disposition of the minor." (*People* v. *Lesnick* (1987) 189 Cal.App.3d 637, 645 [234 Cal.Rptr. 491].)

Here, the trial judge duly noted the change in legislative intent concerning the weight afforded the CYA's recommendation. The judge stated that in "examining the annotated codes on section 707.2, I notice[d] there are a number of cases that discuss the binding effect of the Youth Authority recommendation, particularly People versus Carl B. . . . . And the first impression I got was [that] this court was bound by [the CYA's] recommendation . . . . [¶] However, 707.2 was amended following that decision apparently to avoid the effect of that decision." The court continued by observing that "[a]t the time of Carl B., the primary criteria in deciding whether . . . a minor should be sentenced to the Youth Authority as opposed to the Department of Corrections resolved [*sic*] around the suitability of the minor, the training and treatment offered by the Youth Authority and the needs of the minor. [¶] The Legislature apparently having some misgivings about those factors being the sole criteria amended this section and added [other criteria]."

In the instant case, the CYA found the defendant amenable to the treatment and training offered by the CYA. (See appen. II.)[15] An initial probation officer's report also indicated that there was "ample time for this minor to be dealt with under the juvenile court law." In a subsequent probation report prepared for purposes of the sentencing hearing, however, the recommenda-

---

[15]We note that the CYA's evaluation of the defendant was based on incomplete information. As stated in its amenability determination, the CYA was "not provided with either the police reports, nor the juvenile court fitness report, so must rely upon the very sketchy probation report and the young man's input. His veracity is unknown." So, for example, the Youth Authority was under the misimpression that the defendant had a record of only three prior offenses, when, in fact, he had six, including one for burglary and five for alcohol and marijuana abuse. Also apparently unknown to the CYA was the fact that the defendant had failed to follow through on required counseling for one of those offenses and that he had failed to appear for adjudication on another. On this latter offense, a bench warrant was out on the defendant for nearly a year, until the authorities once again arrested him.

tion was that defendant be housed at the Youth Authority for the term prescribed by law and that he thereafter be transferred to the Department of Corrections for the remainder of his sentence.

In the second probation report, the probation officer concluded that the "defendant's motivation to better his situation in life and his prognosis are considered extremely poor." The report noted no circumstances in mitigation and said that there were two in aggravation: (1) that the victim was particularly vulnerable and (2) that the planning, sophistication or professionalism with which the crime was carried out indicated premeditation.

After reviewing all three reports, the trial court decided to follow the sentencing choice and reasoning of the second probation report. The court stated that the crime "involved a violent confrontation of multiple persons against a single unarmed individual" and that even after the defendant had stabbed the victim, "he continued to kick at [him]."

The court did not find the defendant to be truly remorseful or "aware of the error of his thinking [and] actions" and the court expressed concern that if the defendant were "devoted to his fellow gang members and their creed, [he might] seek them out, return and continue in that type of conduct." From the various evaluations of the defendant, the court believed that the defendant's "prognosis for change . . . [was], at best, marginal."[16]

In explaining its sentencing choice, the court said, "[i]t's the court's feeling that based on the seriousness of the offense, and particularly the viciousness of this defendant's conduct in concert with his peers, plus the need to protect society, that he should not be committed to the Youth Authority. [¶] Moreover, the court feels that the interest of justice would not be served by committing him to the California Youth Authority . . . . [¶] It is the court's intention to sentence him to the Department of Corrections."

The court tempered its sentencing choice by ordering the defendant housed at the Youth Authority pursuant to section 1731.5 of the Welfare and Institutions Code. The court reasoned that "based on [defendant's] youth and his present physical stature . . . it would be better that he serve at least the earlier years of his commitment in the Youth Authority for his own protection. [¶] And if in fact there are training and treatment programs that can be made available to him, the court feels that he should be given the opportunity to participate in those programs. [¶] The difference in what I have done in terms of rejecting the Youth Authority is that under the order

---

[16]The psychiatrist who examined the defendant noted that the defendant's lack of remorse made his prognosis for change "more guarded." (See appen. II, at p. 1392.) Defendant's case worker also said that his "potential for change is at best only fair." (See appen. II, at p. 1393.)

that I'm making, the Youth Authority can hold him until he is 25 years of age."

In making this order, the record shows that the court properly considered the reports and arguments before it as they touched upon those factors delineated in Welfare and Institutions Code section 707.2, as amended in 1982. Clearly, the court considered the CYA's ability to help the defendant and elected to provide him with necessary treatment and training at their facilities through CYA housing.

In light of the defendant's callous slaying of a defenseless victim, after having assaulted the victim's fiancee with a knife, we cannot say that the trial court abused its discretion in determining that "the seriousness of the crimes, the need to protect society and the interests of justice outweighed the needs of the [defendant] and [his] amenability to treatment especially where the latter two considerations were at least partially accommodated through ordering [the defendant] housed at [the] Youth Authority . . . ." (*People* v. *Crenshaw* (1986) 177 Cal.App.3d 259, 265 [222 Cal.Rptr. 824].)

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 20, 1987.

## Appendix I

The jury instruction in *People* v. *Guzman, supra,* 47 Cal.App.3d at page 386, footnote 1, upon which defendant patterned his own requested instruction, read as follows: " 'One of the most important issues in this case is the identification of the defendants as the perpetrators of the crime. The state has the burden of proving identity beyong [*sic*] a reasonable doubt. Therefore, you, the jury, must be satisfied beyong [*sic*] a reasonable doubt of the accuracy of the identification of a defendant before you can convict him. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.

" 'Identification testimony is an expression or belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later.

" 'In appraising the identification testimony of a witness, you should consider the following:

" '1. Are you convinced that the witness had the capacity and an adequate opportunity to observe the offender?

" 'Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, how good were lighting conditions, whether the witness had occasion to see or know the person in the past.

" '2. Are you satisfied that the identification made by the witness subsequent to the offense was the product of his own recollection? You may take into account both the strength if [*sic*] the identification, and the circumstances under which the identification was made.

" 'If the identification by the witness may have been influenced by the circumstances under which the defendant was presented to him for identification you should scruntinize [*sic*] the identification with great care. You may also consider the length of time that lapsed between the occurrence of the crime and the next opportunity of the witness to see defendant as a factor bearing on the reliability of the identification.

" 'You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.

" '3. You may take into account any occasions in which the witness failed to made [*sic*] such an identification of defendant or make [*sic*] an identification that was inconsistent with his identification at trial.

" '4. Finally, you must consider the credibility of each identification witness in the same way as any other witness, consider whether he is truthful, and consider whether he had the capacity and opportunity to make a reliable observation on the matter covered in his testimony.

" 'I again emphasize that the burden of proof on the prosecutor extends to every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged. If after examining the testimony, you have a reasonable doubt as to the accuracy of the identification you must find the defendant not guilty."

## Appendix II

### CYA Evaluation

The CYA's evaluation of the defendant was based upon the findings of a psychiatrist, a psychologist and a caseworker. The psychiatrist, Susan Fukushima (Fukushima), stated that her evaluation of defendant reflected a single personal interview with him and a review of his case file. She concluded that the defendant had become significantly depressed after the death of his father two years before and that he had turned to alcohol and marijuana use thereafter. She noted that defendant had gravitated towards a gang lifestyle because the gang had provided him with emotional support, and that the current offense had apparently occurred in this context. According to Fukushima, defendant denied killing the victim but admitted his presence at the scene and clearly "felt that he had to defend both himself and his friends from what he perceived to be a rival gang." Fukushima opined that defendant's violence potential was significantly elevated by his gang lifestyle and its attendant values. She described the defendant's judgment as immature and his impulse control as impaired.

Fukushima stated the defendant's motivation for change appeared to reflect his concern about incarceration. She also said that the defendant continued to "maintain his innocence and show[ed] *very little remorse* for his actions and this *would make his prognosis more guarded for change*." (Italics added.) Nevertheless, Fukushima indicated that she would recommend counseling to help the defendant deal more appropriately with the death of his father and to separate himself from gang influences by finding other sources of support.

The psychologist, Gary Abrams (Abrams), also reported the defendant's attachment to gang activities. The defendant told him that his friends were primarily "gang, delinquent and drug-oriented persons who 'influence[d] each other' " and that he was involved in gang fighting about once a month. The defendant also told Abrams that he started getting into trouble because he wanted his friends to " 'know that [he] was bad so they would respect [him].' " The defendant further admitted having a history of truancy and that he was " 'always throwing parties with girls and getting high.' "

Abrams gave the defendant psychological tests which revealed "feelings of inadequacy and inferiority, including physical, compensated by aggressive, acting out behavior." Abrams observed that the defendant was "a shallow, self-oriented stubborn, immature, dependent personality lacking sensitivity to others, strong values, strong guilt development, and adequate judgment." Abrams also stated that his "negative peer group, needs for peer attention and approval, masculine and compensatory power strivings and substance abuse are also related to his delinquency and aggressive, assaultive tendencies. [He] is a gang and delinquent-oriented personality with primitive, gruff behavioral tendencies . . . . [He] lacks insight into his problems . . . [and] did not reveal remorse concerning his current offense."

Defendant's caseworker, Wanda LeBlanc (LeBlanc), also evaluated his test results and said they were "indicative of deprived persons lacking formal schooling with less than adequate judgment and 'acting out' tendencies." Defendant told her that his problems began with his gang associations and stated a willingness to fight, despite his preference not to. He also told her that he enjoyed getting high, smoking as many as three to five joints of marijuana a day.

In reviewing his participation in the crimes charged, the defendant told LeBlanc that he had threatened Villapondo but only verbally. He also denied using a knife on Ruiz, but did admit fighting with him. He said he knew who had stabbed Ruiz but refused to name him..

LeBlanc's clinical impression of the defendant was that he was somewhat depressed about having lost his father and about his incarceration. She noted that because defendant was the youngest of five children, he was spoiled a great deal of the time but that he lacked adult male role modeling due to his father's death and because his brothers were too old to be his contemporaries. LeBlanc also stated that defendant's apparently overworked mother could not control him and that defendant "in his quiet way set about ignoring his mother and her dictates to stay out of trouble, [and to] remain in school or work."

LeBlanc concluded that the defendant could benefit from counseling and training at the Youth Authority. However, she also stated that "[h]is *potential for change is at best only fair.*" (Italics added.)