[No. H003572. Sixth Dist. Dec. 19, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
KENT L. LONDON, Defendant and Appellant.

**COUNSEL**

John A. W. Halley, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General,

Laurence K. Sullivan and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

BRAUER, J.—A jury convicted defendant Kent L. London of one count of receiving stolen property and three counts of conspiracy to commit forgery. Because his preimprisonment credit exceeded the 16-month sentence, the court released him from custody and ordered him to report to his parole officer.

London contends on appeal that the court erred in instructing the jury and in limiting closing argument. He also contends that he was entitled to be released without any parole obligation. Finding no error in the trial or the sentence, we affirm.

## I. FACTS

The People charged London by information with one count of receiving stolen property, two counts of robbery, one count of forgery, and three counts of conspiracy to commit forgery. The jury convicted him only of receiving stolen property (count 1) and conspiracy to commit forgery (counts 5, 6, and 7). It failed to reach a verdict on the remaining counts, which the court later dismissed under Penal Code section 1382, subdivision (b).

Because the robbery counts have been dismissed there is no need to set out in detail the facts which underlay them. The robberies are pertinent only because their proceeds included the checkbooks, credit cards, and identification papers that came into London's possession and which he and others used to commit forgeries. Thus, it is necessary to know only that Rebekah Stites, Sandra Tate, and a Black male robbed Marsha and Emily Vargas of these items at gunpoint on February 14, 1986.

On February 15, the day after the robbery, London, Stites, and Tate went on a spending spree. They used the stolen checks and identification papers to make purchases at Sears, the Athletic Attic, and Macy's. These incidents supported the charges of conspiracy to commit forgery and possession of stolen property. The prosecution established its case primarily through the testimony of Stites and Tate, who testified pursuant to plea bargains, and through the testimony of employees of the three businesses. Because all but

one of the issues on appeal relate in some way to identity, we focus our attention on the evidence relevant to that issue.

The forgeries began at Sears in Vallco, a shopping mall in Cupertino. Stites forged a check on Emily Vargas's account to pay for a video cassette recorder. David Distefano, the sales clerk who participated in the transaction, identified Stites in a photographic lineup as the woman who had written the check. Distefano identified someone other than London, however, as the man who had accompanied Stites.

After leaving Sears the three went to the Athletic Attic, a store in the same mall. At that store Stites wrote a second check to pay for two pairs of men's tennis shoes and a man's sweat suit. Two sales clerks were involved in the transaction: Stephanie Simpson and Alexandre Hiroshnichenko. Simpson identified Stites in a photographic lineup but did not identify anyone in court. Hiroshnichenko identified London in court.

The three next drove to Valley Fair, a mall in San Jose. They encountered difficulties at Macy's, where Stites forged a third check to buy a gold neck chain for London. When Cindy Hintz, the sales clerk, called the store's credit department for approval, Stites and Tate became scared and walked toward the door, leaving Vargas's identification behind. London stayed at the counter. A few minutes later Hintz told London that Macy's would not accept the check. London took the check and walked toward the door, tearing up the check as he went.

Scott Emery, a security agent for Macy's, had observed the transaction. Outside Macy's, he and three other agents confronted London, Stites, and Tate in the parking lot near their car. London became nervous and walked across the street and out of sight behind a service station. Emery and Michelle Degmetich followed. After a few minutes London reappeared and told the agents that he would talk with them. Together they walked back to the mall's parking lot, where London asked one of his companions for the keys to the car. When she refused to part with them he fled across the street through moving traffic. By the time the traffic had cleared sufficiently for the security agents to follow, London was out of sight.

Meanwhile, Tate permitted security agents to search the car. The search revealed more checks, credit cards, and other property taken in the robbery.

The events at Macy's produced identifications of London in court by four eyewitnesses: Hintz, the sales clerk, and Emery, Elizabeth Williams, and Donna Galletti, three of the security agents who had seen London in the parking lot. Hintz also identified London in a photographic lineup.

Stites and Tate testified that London was the person who had accompanied them during the forgeries.

To cast doubt upon these identifications the defense called Kenneth McDonald, who was Stites's boyfriend and in jail at the time the offenses occurred. The defense hoped to prove that the man who had accompanied Stites and Tate was Stites's husband, not the defendant. McDonald testified that Stites telephoned him a few days after February 14. She told him that she had been in police custody because she, Rebekah Tate, and her husband had committed a robbery on February 14 and attempted to use stolen checks the next day. McDonald did not know Tate's husband's name. In her own testimony Stites denied that she had been with her husband on February 14 or 15.

## II. Discussion

We do not accept London's claims of instructional error. One claim, concerning the instruction on flight, we discuss in detail; recent decisions of the Supreme Court dispose of the others. We hold that the trial court did not abuse its discretion by limiting closing argument. The Penal Code does not support London's claim to a parole-free release. Finally, since we find no error, there is no reason to address the subject of cumulative error.

### A. Jury Instructions on Flight (CALJIC No. 2.52) and Destruction of Evidence (CALJIC No. 2.06)

The trial court instructed the jurors that the law permitted them to consider London's flight from Macy's security agents and his attempt to destroy a forged check as facts relevant to his guilt or innocence. (CALJIC No. 2.52 [flight], No. 2.06 [destruction of evidence].) London contends that these instructions are always erroneous when identity is an issue in the case. We disagree.

The two instructions raise similar considerations. We consider first the instruction on flight, CALJIC No. 2.52:

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The

weight to which such circumstance is entitled is a matter for the jury to determine."[1]

To be sure, if identity is the *only* issue in a case, evidence of flight is irrelevant and the instruction is improper. (*People* v. *Parrish* (1986) 185 Cal.App.3d 942, 948 [230 Cal.Rptr. 118].) The reason is clear. Flight supports an inference that the actor was conscious of guilt. (*People* v. *Mulqueen* (1970) 9 Cal.App.3d 532, 543 [88 Cal.Rptr. 235].) But that a certain person was observed fleeing from, say, the scene of a robbery and thereby manifested a consciousness of guilt is of no consequence unless the person fleeing was the defendant. On the other hand, if consciousness of guilt is relevant to an issue in the case (and if there is substantial evidence of flight) the instruction must be given. (Pen. Code, § 1127c; use note to CALJIC No. 2.52.)

This, essentially, is what we held in *People* v. *Scott* (1988) 200 Cal.App.3d 1090, 1094-1095 [246 Cal.Rptr. 406]. But London's argument finds support in holdings that a trial court should not instruct on flight if identity is "an issue in the case" or "the main issue." (*People* v. *Jackson* (1986) 187 Cal.App.3d 499, 511 [231 Cal.Rptr. 889]; *People* v. *Malgren* (1983) 139 Cal.App.3d 234, 242 [188 Cal.Rptr. 569]; *People* v. *Moringlane* (1982) 127 Cal.App.3d 811, 821-822 [179 Cal.Rptr. 726]; *People* v. *Salazar* (1980) 108 Cal.App.3d 992, 998 [167 Cal.Rptr. 38]; *People* v. *Anjell* (1979) 100 Cal.App.3d 189, 199-200 [160 Cal.Rptr. 669].)

London argues that such a rule is necessary to prevent the jury from misapplying irrelevant evidence of flight to the issue of identity. But the rule goes too far. If the People rely upon evidence of flight to show consciousness of guilt, then CALJIC No. 2.52 is proper. The jury must know that it is entitled to infer consciousness of guilt from flight and that flight, alone, is not sufficient to establish guilt. (Pen. Code, § 1127c.) The jury's need to know these things does not change just because identity is also an issue. Instead, such a case requires the jury to proceed logically by deciding first whether the suspect was the defendant and then, if the answer is affirmative, how much weight to accord to flight in resolving the other issues bearing on guilt. The jury needs the instruction for the second step.

If there is reason to be concerned that evidence of flight will confuse the jury in its deliberations on identity, then the solution to that problem is to

---

[1] CALJIC No. 2.52 derives from Penal Code section 1127c: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given." (Pen. Code, § 1127c.)

instruct more precisely—not to withhold the needed instruction on flight. For example, the court might at defendant's request instruct the jury in this way: There has been evidence that the perpetrator fled immediately after the alleged crime was committed. Do not consider that evidence for any purpose unless and until you have determined beyond a reasonable doubt that the defendant was the person who fled.

And omission of the instruction may also redound to the disadvantage of the defendant. In its absence, the jury might consider flight as sufficient for a finding of guilt. There are cases in which the defendant complained of the failure to give the flight instruction. (*People* v. *Roy* (1971) 18 Cal.App.3d 537, 551 [95 Cal.Rptr. 884], disapproved on unrelated grounds in *People* v. *Ray* (1975) 14 Cal.3d 20, 32 [120 Cal.Rptr. 377, 533 P.2d 1017]; *People* v. *Sheldon* (1967) 254 Cal.App.2d 174, 181 [61 Cal.Rptr. 778]; *People* v. *Williams* (1960) 179 Cal.App.2d 487, 490-491 [3 Cal.Rptr. 782].)

To withhold the flight instruction whenever identity is *one* of the issues also disregards Penal Code section 1127c. Under that section, "[i]n any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court *shall* instruct the jury" on flight. (Pen. Code, § 1127c, italics added.) Although section 1127c does not help the court decide whether evidence of flight is relevant in any particular case, once the court has made that decision and admitted evidence of flight the statute requires the instruction. ▮▮▮▮▮ The use note to CALJIC No. 2.52 makes this clear: "Where evidence of flight is relied upon as tending to show guilt, an instruction such as this must be given sua sponte as required by Penal Code, § 1127c."[2] Appellate decisions have also recognized the requirement. (*People* v. *Scott, supra,* 200 Cal.App.3d at pp. 1094-1095; *People* v. *Sheldon, supra,* 254 Cal.App.2d 174, 181; *People* v. *Williams, supra,* 179 Cal.App.2d 487, 490-491.)

▮▮▮ The authority for withholding the flight instruction has never been very persuasive. Each of the cases London cites relies on dictum in *People* v. *Anjell, supra.* That court wrote: "The fact that the perpetrators fled the scene of the crime cannot warrant an instruction on flight where identity is *a* contested issue." (*Anjell, supra,* 100 Cal.App.3d at p. 199 [italics added].) This remark was dictum because the issue in *Anjell* was whether there was

---

[2]London invokes the comment to CALJIC No. 2.52 as support for his argument, but the comments merely set out relevant and sometimes contradictory authorities. In this case, the comment cites *People* v. *Malgren, supra,* 139 Cal.Rptr. 234, as holding that it is error to give the instruction when the identity of the perpetrator who fled is in question.

The comments assist research. They are to be distinguished from the use notes, without reference to which "no trial judge should ever give an instruction." (*People* v. *Haslouer* (1978) 79 Cal.App.3d 818, 830 [145 Cal.Rptr. 234].)

sufficient evidence of flight to support the instruction, not whether the issue of identity made the instruction improper. (*Id.* at pp. 199, 201-202.)

Although the *Anjell* dictum is frequently repeated, we have not found a reported opinion which relies upon it to reverse a conviction. The cases reveal this pattern: Trial courts give the instruction when the defendant disputes both identity and other factors bearing on guilt. Appellate courts, faced with persuasive evidence of identity, pay hollow deference to the *Anjell* dictum by finding the error to have been harmless.

*Anjell*'s dictum first inspired such a holding in *People* v. *Salazar, supra,* 108 Cal.App.3d 992. That court affirmed a conviction for kidnapping. The defendant jumped in the victim's car, forced her to drive three-quarters of a mile, assaulted her, and then ran away. The defendant presented an alibi defense (*id.* at p. 997) and also contested the elements of kidnapping. (*Id.* at pp. 998-1000.) Purporting to rely on *Anjell,* the *Salazar* court held it was error to instruct on flight because identity was "the *main* issue." (*Salazar, supra,* 108 Cal.App.3d at p. 998, italics added.) The court found the error harmless, however, since "there [was] *overwhelming* evidence which show[ed] that [the defendant] committed the offense." (*Id.* at p. 998, italics added.) The "overwhelming" evidence included the defendant's own admission that he was in the area of the crime at the time it occurred, the victim's "certain" identification, and the testimony of several other witnesses, who corroborated the victim's description of the defendant's distinctive clothing. (*Ibid.*)

The *Salazar* opinion does not convincingly explain the finding of error. Since "overwhelming" evidence permitted the jurors to find that the witnesses had correctly identified the defendant, the jurors were likely to reach the issue of whether he had committed the charged offense. The defendant's flight supported the inference that he had. Yet the *Salazar* opinion would bar a trial court from telling a jury that the inference is proper. Why?

There have been several more holdings of harmless error since *Salazar.* These decisions appear to prohibit the flight instruction whenever identity is contested, whether or not it is the only issue. (*People* v. *Jackson, supra,* 187 Cal.App.3d at p. 511; *People* v. *Malgren, supra,* 139 Cal.App.3d at p. 242; *People* v. *Moringlane, supra,* 127 Cal.App.3d at p. 821.) We say "appear to prohibit" because, while it is clear that identity was an issue in these cases, it is not clear whether it was the only issue. This makes these cases very weak support indeed for perpetuating the *Anjell* dictum.

A few recent decisions do not blindly repeat the *Anjell* dictum. This court's opinion in *People* v. *Scott, supra,* 200 Cal.App.3d at pp. 1094-1095,

is one. Another is *People* v. *Cowger* (1988) 202 Cal.App.3d 1066, 1076-1077 [249 Cal.Rptr. 240]. The court held that it was proper to instruct on flight because there was substantial evidence of flight, even though identity was also at issue. The court expressly declined to follow the *Anjell* dictum. A third is *People* v. *Mask* (1986) 188 Cal.App.3d 450 [233 Cal.Rptr. 181], which holds that the flight instruction "is improper where identity is the *only* issue contested at trial." (*Id.* at p. 456, italics added.)

Nothing illustrates the *Anjell* dictum's overbreadth better than the facts of the case before us. Overwhelming evidence of identity made it virtually certain that the jury would resolve that issue against the defendant and proceed to the issue of guilt. No fewer than seven nonaccomplice eyewitnesses identified London as the man who had accompanied Stites and Tate. London's flight from Macy's security agents tended to show consciousness of guilt, and, thus, that his presence during the forgeries had not been innocent. To have withheld the instruction on flight would have hampered the jury's proper deliberations by forbidding a permissible inference from relevant evidence. Accordingly, it was not error to give CALJIC No. 2.52. We reject statements to the contrary in *Anjell, Salazar,* and their progeny.

■ CALJIC No. 2.06, which concerns the destruction of evidence, raises similar considerations.[3] Dealing as it does with an inference of guilt arising from conduct, it has no place when the defense concedes that the person who destroyed evidence—whoever it may have been—committed the offense. But when the elements of the crime are also at issue the instruction serves a legitimate purpose. Because the court admitted evidence that London had destroyed a forged check, and because the prosecution needed to prove that London had participated in the forgery, it was not error to tell the jury that his actions implied consciousness of guilt.

### B. *Proposed Cautionary Instructions on Eyewitness Identification*

■ The defense proposed three instructions on eyewitness identification. The proposed instructions would have directed the jury to view with caution all eyewitness identifications generally,[4] and identifications by

---

[3] The trial court gave CALJIC No. 2.06 in this form: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by destroying evidence, such attempts may be considered by you as a circumstance tending to show a consciousness of guilt. However, such evidence is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your consideration."

[4] Defendant's proposed instruction No. 2: "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the person who committed the crimes charged. The law recognizes that eyewitness identification is not always reliable, and that cases of mistaken identity have been known to occur. You should therefore view eyewitness

strangers[5] and members of other racial groups[6] in particular. The court refused these instructions and gave instead CALJIC Nos. 2.91 and 2.92. We find no error.

The Supreme Court has recently held that it is both improper and unnecessary to instruct that eyewitness identification should be viewed with caution. (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1152-1154 [248 Cal.Rptr. 600, 755 P.2d 1049].) "A special cautionary instruction is unnecessary because the 'factors' instruction [CALJIC No. 2.92] already required properly highlights the factors relevant to defendant's concerns about the reliability of eyewitness identification testimony in a particular set of circumstances." (*Id.* at p. 1153.) It is improper because it takes an argumentative position on a question of fact. In the Supreme Court's words, such an instruction would "usurp the jury's role as the exclusive trier of fact by binding it to the view that eyewitness identifications are often mistaken." (*Id.* at p. 1153.)

London's proposed instructions on identifications by strangers and members of other racial groups were redundant. CALJIC No. 2.92 addresses both subjects in its list of factors bearing on the accuracy of identifications. By giving No. 2.92, the trial court specifically told the jury that it should consider "[t]he cross-racial or ethnic nature of the identification" and "[w]hether the witness had prior contacts with the alleged perpetrator." With CALJIC No. 2.91 the court correctly related the concept of reasonable doubt to the issue of identity.[7]

---

identification testimony with caution, and evaluate it carefully in light of the factors I shall discuss."

Defendant's proposed instruction No. 4: "Where the prosecution has offered identification testimony, that is, the testimony of an eyewitness that he saw the defendant commit the act charged, such testimony should be viewed with caution. An identification by a stranger is not as trustworthy as an identification by an acquaintance. Mistaken identification is not uncommon, and careful scrutiny of such testimony is especially important."

[5] Defendant's proposed instruction No. 4. See footnote 4, *ante.*

[6] Defendant's proposed instruction No. 1, in relevant part: "In general, people are better at identifying persons they already know than persons with whom they have had no previous contact. [¶] . . . Studies show that when the witness and the person he is identifying are of different races, and particularly when the witness is white and the offender is black, the identification tends to be less reliable than if both persons are of the same race. . . . [¶] . . . Memory tends to fade over time. And studies show that a witness may subconsciously incorporate into his memory information from other sources, such as descriptions by other witnesses."

[7] CALJIC No. 2.91 instructs: "The burden is on the State to prove beyond a reasonable doubt that the defendant is the person who committed the offense with which he is charged. [¶] If, after considering the circumstances of the identification and any other evidence in this case, you have a reasonable doubt whether defendant was the person who committed the offense, you must give the defendant the benefit of that doubt and find him not guilty."

CALJIC Nos. 2.91 and 2.92 were sufficient in this case. ■ As the Supreme Court has held, "a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence." (*People* v. *Wright, supra,* 45 Cal.3d at pp. 1141.) Instructions on this subject must be "neutral and nonargumentative," so as not to "invad[e] the domain of either jury or expert witness." (*Id.* at p. 1143.) ■ To emphasize factors already set out CALJIC No. 2.92 by repeating them in additional instructions is argumentative. For this reason the trial court correctly refused the proposed instructions.

### C. *Proposed Instruction Regarding a Third-party Perpetrator*

■ The court also refused to instruct the jury that the defendant did not need to prove another person had committed the crime. We find no error because other instructions adequately conveyed this principle to the jury.

London's proposed instruction included the following paragraph: "[Y]ou are instructed that it is not necessary for the defendant to prove that another person may have committed the crime, nor is it the burden of the defendant to prove his innocence. If facts and circumstances have been introduced into evidence which raise a reasonable doubt as to whether the defendant was the person who committed the crime charged, then you should find the defendant not guilty of the offense."

The jury needed to hear two principles: first, that it was the People's burden to show beyond a reasonable doubt that the defendant was the perpetrator, and second, that the defendant did not need to prove anything at all. The combination of CALJIC Nos. 2.90 and 2.91 adequately conveyed these ideas. CALJIC No. 2.90, the standard instruction on the presumption of innocence and the state's burden to prove guilt beyond a reasonable doubt, explained that the defendant did not need to prove anything. CALJIC No. 2.91 related the concept of reasonable doubt to the issue of identity by explaining that "the burden is on the State to prove beyond a reasonable doubt that *the defendant is the person* who committed the offense with which he is charged." (Italics added.)

Our reasoning follows *People* v. *Wright, supra,* in which the Supreme Court held that CALJIC Nos. 2.90 and 2.91 made repetitious and unnecessary an instruction essentially identical to that which London proposed. (*People* v. *Wright, supra,* 45 Cal.3d at pp. 1134 and fn. 3; see also *People* v. *Martinez* (1987) 191 Cal.App.3d 1372, 1378-1379 [237 Cal.Rptr. 219].)

## D. *Limitation of Closing Argument*

■ The trial court did not permit defense counsel to refer during closing argument to an article in Time magazine. According to counsel the article reported an instance in which an eyewitness to a crime mistakenly identified a district attorney as the perpetrator.

■ There is no rule to the effect that attorneys may always refer to magazine articles in closing argument. While attorneys may "state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature" (*People* v. *Love* (1961) 56 Cal.2d 720, 730 [16 Cal.Rptr. 777, 366 P.2d 33], disapproved on unrelated grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; *People* v. *Martinez, supra,* 191 Cal.App.3d 1372, 1385-1386), they may not confuse the jury with hearsay in the form of "irrelevant facts" about "unrelated specific crimes." (*People* v. *Mendoza* (1974) 37 Cal.App.3d 717, 725 [112 Cal.Rptr. 565].) "[W]hether a particular newspaper or magazine article should be read to the jury, is a matter that is addressed to the sound discretion of the trial court." (*People* v. *West* (1983) 139 Cal.App.3d 606, 610-611 [189 Cal.Rptr. 36].)

■ In this case it appears that the trial court properly excluded hearsay about a particular, alleged instance of misidentification which had nothing to do with the case before it. The court did not, however, foreclose all argument about the prevalence of misidentification. This was the court's ruling: "If you want to say that in general, that there are repeated instances [of mistaken identity] in magazines, you can say that. But if you point to a specific article and hold up Time magazine or any other magazine, in support of that, that would be objectionable." To the extent counsel was able to make the argument from common experience, he remained free to do so.

London points to opinions in which courts have held that particular magazine and newspaper articles were appropriate subjects for closing argument. (See, e.g., *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 392 [121 Cal.Rptr. 69]; *People* v. *Woodson* (1964) 231 Cal.App.2d 10, 15 [41 Cal.Rptr. 487].) But such decisions, which reflect particularized exercises of judicial discretion under other circumstances, did not deprive the trial court of discretion in the case before it. Nothing in the record suggests an abuse.

## E. *Presentence Credit*

The trial court sentenced London to prison for a term of 16 months. Because the court sentenced under Penal Code section 1170, the code auto-

matically imposed a parole term "not exceeding three years." (Pen. Code, § 3000, subd. (a).) Since London had acquired preimprisonment credit in excess of the prison term the court released him from custody and ordered him to report to a parole officer.

 On appeal London argues that he was entitled to be released without any parole obligation, even though his preimprisonment credit is less than the total of his prison and parole terms. London bases his argument on this language from Penal Code section 1170, subdivision (a)(2): ". . . In any case in which the amount of preimprisonment credit under Section 2900.5 or any other provision of law is equal to or exceeds any sentence imposed pursuant to this chapter, the entire sentence, including any period of parole under Section 3000, shall be deemed to have been served and the defendant shall not be actually delivered to the custody of the Department of Corrections." (Pen. Code, § 1170, subd. (a)(2).)

London's argument requires one to believe that the term "sentence," as used in the quoted language, has a different meaning each time it is used. "Sentence" must mean "prison term" in the first clause and "prison term plus parole term" in the second. Thus (to complete the argument), when preimprisonment credit exceeds the jail term, both prison and parole terms shall be deemed to have been served.

This interpretation is possible only if one ignores other sections of the Penal Code which make it clear that a "sentence" includes both a prison term and any parole term. Section 3000 states that "[a] *sentence pursuant to Section 1168 or 1170 shall include a period of parole,* unless waived, as provided in this section." (Pen. Code, § 3000, italics added.) Consistent with section 3000, section 1170, subdivision (c), requires the court to inform the defendant "that *as part of the sentence* after expiration of the term he or she may be on parole for a period as provided in Section 3000." (Pen. Code, § 1170, subd. (c), italics added.)

Arguing from principle leads to the same conclusion. Why would the Legislature want to provide a windfall in the form of a parole-free release to convicted criminals who, purely by chance, serve their terms of incarceration before sentencing rather than after? The argument ignores the important policy expressed in Penal Code section 3000, which provides that parole shall follow incarceration except in very unusual cases. In that section the Legislature "finds and declares that the period immediately following incarceration is *critical* to successful reintegration of the offender into society and to positive citizenship. It is in the interest of public safety for the state to provide for the supervision of and surveillance of parolees and to provide educational, vocational, family and personal counseling necessary

to assist parolees in the transition between imprisonment and discharge." (Pen. Code, § 3000, italics added.)

The other courts that have decided this issue agree, essentially for the same reasons. (*In re Welch* (1987) 190 Cal.App.3d 407, 411-412 [235 Cal.Rptr. 470]; *In re Jantz* (1984) 162 Cal.App.3d 412, 416-418 [208 Cal.Rptr. 619].) The court in *In re Ballard* (1981) 115 Cal.App.3d 647, 649 [171 Cal.Rptr. 459], in the footnote, suggested the opposite conclusion in dictum[8] but did not consider the other provisions of the Penal Code which clarify the meaning of section 1170. There was no error in sentencing.

### DISPOSITION

The judgment is affirmed.

Agliano, P. J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 30, 1989.

---

[8]The court in *Ballard* ordered the Department of Corrections to reduce the petitioner's parole term by the amount of unused presentence conduct credits. (*In re Ballard, supra,* 115 Cal.App.3d at p. 650.) This holding is entirely consistent with Penal Code section 1170. For no apparent reason, however, the court went on to speculate about section 1170's application in a case not before it: "a . . . determination that [a prisoner's] credits equal or exceed the assigned prison term will operate to release the defendant from any term of parole." (*In re Ballard, supra,* 115 Cal.App.3d at p. 649, fn.) The court offered no explanation to support this assertion.