Filed 6/14/13  P. v. Romero CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY ANGEL ROMERO,<br><br>    Defendant and Appellant. | H037094<br>(Santa Clara County<br> Super. Ct. No. CC789592) |

The Santa Clara County District Attorney filed an information charging defendant Jeffrey Angel Romero with two counts of second degree burglary (Pen. Code, §§ 211, 212.5, subd. (c)[1] - counts one and three) and one count of felony imprisonment (§§ 236, 237 - count two).  The information also alleged:  (1) defendant personally used a firearm within the meaning of section 12022.53, subdivision (b) when he committed the offenses charged in counts one and three, and (2) he personally used a firearm within the meaning of sections 12022.5, subdivision (a) and 1203.06 when he committed the offense charged in count two.  The jury found defendant guilty as to counts one and two, and not guilty as to count three.  The jury also found that the allegations of the firearm use enhancements were true as to counts one and two.  The trial court sentenced defendant to 18 years in prison.  On appeal, defendant contends:  (1) the trial court erred when it admitted

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.

evidence of uncharged offenses, (2) the trial court abused its discretion in denying trial counsel's request to read two articles on the unreliability of eyewitness identification evidence, and (3) the trial court erred when it awarded no custody credits to defendant. We reverse the judgment and remand the matter for resentencing.

## I. Statement of Facts

### A. The Prosecution's Case

### 1. The San Jose Robbery - Counts One and Two

Parul Parikh worked as a cashier at a Valero gas station in San Jose. At approximately 2:40 p.m. on June 8, 2007, she was talking to Michael Lima, a salesman, when a man entered. The man, who was wearing a black jacket with a hood, asked about some candy and Parikh directed him toward it. However, the man then came behind the counter, asked for money, and gave Lima a black bag to give to Parikh for the money. Parikh did not remember if the man was holding a gun. She took the money from the cash register and put it in the bag. Before he left, the man told them to sit down and not do anything. Both Parikh and Lima sat down on the ground. A few seconds later, the manager of the car wash entered.

Parikh subsequently attended a lineup in Sonoma County, but she was unable to identify anyone as the robber. She testified that she did not get a good look at the robber's face and was unable to remember his race, hair color, height or whether he had facial hair.

Officer Mark Efigenio was dispatched to the Valero gas station on the day of the robbery. He spoke with Parikh, who told him that the robber displayed a gun which made her very scared. The robber handed Lima a black plastic bag and ordered Parikh to open the cash register. Lima gave it to Parikh. She placed between five and six hundred dollars in the bag. The robber then ordered her to lie on the ground. She described the robber as a Hispanic male, about 35 years old, and possibly with a beard.

Michael Lima testified that he was working as a wholesaler who restocked display cases with novelty items in June 2007. On June 8, 2007, he was at the Valero gas station when a man entered and pointed a gun at his head. The robber said, "As long as no one causes trouble, no one will get hurt." The robber tried handing a black plastic bag to Lima, but Lima put his hands up, stood back, and said, "Hey, I don't even work here." After he got the money, the robber said, "Okay. Everyone on the floor. Get on your bellies. Count to 30." As soon as the robber left, Lima called 911.

Lima described the robber as around 5 feet 7 inches to 5 feet 8 inches tall, mid- to late 20's, Hispanic, and weighing 175 to 180 pounds. The robber was wearing a hood and his arms were covered. His gun was a black and silver semiautomatic pistol, and Lima heard the slide of the gun being pulled back and locked into place. Lima viewed an in-person lineup in Sonoma County several months later, but did not recognize anyone.

Raul Hernandez was working as the manager of the station's detail shop when the robbery occurred. He walked into the store and saw Parikh and Lima on the ground. After Parikh told him that there had been a robbery, Hernandez saw a guy with a black hoodie running out the back door and leave in a white truck. Hernandez ran after the truck to try and get a license number, but there was no plate on the truck. When the truck was stopped at a red light, Hernandez noticed that there was damage on the back bumper of the truck and the windows were tinted. Hernandez identified a photograph of a truck (exhibit 16) as similar to the one that he saw. While Hernandez was looking at the truck, the robber rolled down his window, pointed a gun at him, and asked if he had a problem. According to Hernandez, the robber was wearing a black tank top, and he had black hair "[l]ike a fade" or a "soldier-style flat top." The robber also had a goatee and a mustache.

Hernandez did not remember that he told the police that the man did not point the gun at him. He also did not remember whether he told the police that the robber's arms were hairy. He thought that the robber used his right hand when he pointed the gun at

him.  When the police showed him photographs of individuals a few weeks later, he did not identify anyone as the robber.

Sergeant Randy Schriefer testified that he participated in the investigation of the Valero gas station robbery on June 8, 2007.  He interviewed Hernandez on July 5, 2007.  Hernandez told him that there was damage to the rear license plate frame of the truck, the front driver's window was tinted, and the person in the truck rolled down the window and brandished a handgun.  Hernandez described the man as Hispanic, approximately 26 years old, with a goatee, and black hair that was shaved on the sides, and weighing 170 pounds.  Hernandez also stated that the man had hairy arms.  Schriefer was present when Detective John McElvy showed Hernandez a photo lineup on December 3, 2007.  Defendant was a suspect at that time.  Hernandez chose defendant's photograph.  According to Schriefer, Hernandez was "confident" of his identification.

Alicia Stephens, defendant's wife, testified that she and defendant were living in Petaluma in May through July 2007.  According to Stephens, defendant does not have hairy arms, but he has colorful tattoos from his wrist to his elbow.

### 2.  The Los Gatos Robbery - Acquittal on Count Three

The evidence as to count three was based on the preliminary hearing testimony of Kourosh Adeli that was read into the record because Adeli had left the country.  Adeli testified that he was working at the Union 76 gas station in Los Gatos on June 8, 2007.  At approximately 1:57 p.m., a man entered the store with a plastic bag, took the money, and told him not to say anything or he would kill him.  The robber had a gun.  Adeli put the money in the bag.  The robber pushed Adeli's head to the ground and told him to wait for five minutes.  Adeli described the robber as Mexican-American, wearing a black jacket, and with a two-inch scar on his face.

Officer Joseph Romeo was dispatched to the Union 76 station on Los Gatos Boulevard at about 2:00 p.m. on the day of the robbery.  Adeli told him the robber was

wearing a black sweatshirt with the hood pulled up, black pants or shorts, and black shoes.  He also said that the robber had a Spanish accent.

Officer Leyton Howard testified that he was present when Adeli was shown a photo lineup on December 5, 2007.  Adeli identified defendant's photo as the robber.

### 3.  Evidence of Other Crimes

#### a.  San Leandro Robbery

Santos Rivas was working at the Marina Shell gas station in San Leandro on May 8, 2007, when a man, who was wearing a black hoodie and black jeans, entered.  He was either white or Mexican.  Rivas identified defendant as that man at trial.  Defendant walked to the counter, displayed a gun, threw a plastic bag at her, and said, "Give me the money."  She asked if he was "playing," and he said, "No."  When Rivas opened the register and began taking out the quarters, defendant said, "Fuck the change."  She grabbed the bills and put them in the plastic bag.  Defendant's gun had a slide on top that pulled back.  After he had the money, defendant told her to lie on the ground and count to 100.  Rivas was unable to identify defendant in an in-person lineup in Sonoma County.  However, she identified defendant in a photo lineup.

Officer Louie Guillen was dispatched to the Shell gas station at about 7:45 p.m. on May 8, 2007.  Rivas told him that the robber held a black semiautomatic handgun in his left hand and told her to get on the ground and count to 30 before he left.  Rivas described the robber as 24 or 25 years old, 5 feet 9 inches tall, about 170 pounds, and with a goatee and mustache.

#### b.  Sebastopol Robbery

Robert Ramos testified that he was working at the Valero gas station in Sebastopol on November 11, 2007.  After Ramos placed some money in the safe, there remained $300 to $400 left in the register.  At that point, a man entered the store, placed a plastic bag on the counter, pulled out a two-toned gun, and asked Ramos to open the register.  At trial, Ramos identified defendant as the robber.  After Ramos put the money in the bag,

defendant ordered him to get on the floor and count to 30 or he would "blow [his] head off."

After the robber left, a customer entered the store and told Ramos that the robber had driven away in a white pickup truck and was travelling south. Ramos called the police and reported the robbery and the information from the customer. According to Ramos, the robber was wearing jeans and an olive zip-up hooded sweatshirt and had a "fairly thick beard." The police detained a suspect and transported Ramos to the location where he was being held. Ramos identified this individual, who was defendant, as the robber. When Ramos identified defendant, he was surprised that he did not have a beard.

Sergeant Michael Nielsen testified that he received a dispatch call of a robbery in progress at the Valero gas station at approximately 3:05 p.m. on November 11, 2007. He eventually stopped a white pickup truck driven by defendant. Officers searched defendant's truck and found an olive gray sweatshirt, $308 in cash in a plastic bag, a handgun with eight rounds in it, and a box of ammunition. The gun was a semiautomatic. The cash in the bag was organized by denomination. Defendant had "a beard, maybe a week's growth."

### 4. Other Evidence

Tai Nguyen, a former San Leandro police detective, conducted an investigation of the San Leandro robbery. He opined that the San Leandro robbery was related to the San Jose, Los Gatos, and Sebastopol robberies based on the description of the suspect, the weapon used, and the manner in which the robberies were committed. After defendant was arrested, Nguyen met with him. At that time, defendant signed a document with his left hand which was consistent with his information that the robber had used his left hand to hold the gun in each of the robberies.

The parties stipulated that on May 8, 2007, Officer Timothy Degrano recovered a latent fingerprint from the interior frame of the main door of the Shell gas station in San

Leandro that the suspect had appeared to touch. It was determined that the latent fingerprint did not belong to defendant.

The parties also stipulated that defendant was employed by GMC Tech from September 2006 to June 18, 2007. Defendant's employment records showed that defendant left work at 3:45 p.m. on May 8, 2007, and that he did not work on May 25, 2007, and June 4, 2007. Defendant worked from 7:26 a.m. until 3:47 p.m. on June 5, 2007, from 7:24 a.m. until 2:53 p.m. on June 6, 2007, from 7:26 a.m. until 2:37 p.m. on June 7, 2007, and from 7:20 a.m. until 10:50 a.m. on June 8, 2007.

## B. Defense Case

Deputy Eduardo Fernandez of the Sonoma County Sheriff's Department testified that he conducted an in-person lineup on July 9, 2008. According to Fernandez, defendant was 5 feet 9 inches tall and weighed 210 pounds when he was booked.

Jeffrey Gilbert Romero, defendant's father, testified that he celebrated Father's Day, which was on June 17, with defendant on June 8, 2007. Defendant arrived at his father's house in Vallejo at 2:15 p.m. or 2:45 p.m. They left at around 3:15 p.m., ate at a Mexican restaurant, took a walk at the marina, and returned to Vallejo around 6:00 p.m.

Esther Rabuco, defendant's mother, testified that she visited defendant the day after he was arrested and he looked like he did in a photo that was admitted in evidence.

Pursuant to a defense request, the trial court allowed defendant to roll up his sleeves and display his arms to the jury.

## II. Discussion
### A. Other Crimes Evidence

Defendant contends that the trial court abused its discretion under Evidence Code sections 1101 and 352 when it admitted evidence of the uncharged robberies that were committed in San Leandro and Sebastopol.

## 1. Background

The prosecutor brought a motion to admit evidence of 14 uncharged robberies to prove the identity of the perpetrator of the charged crimes and to show the charged crimes were part of a common scheme or plan. Defendant brought a motion to exclude evidence of the uncharged robberies.

At the hearing on the motions, the trial court noted that the prosecutor had "agreed to whittle down the list to eight" uncharged robberies. Following argument, the trial court ruled that the prosecutor could elicit evidence of the robbery in Sebastopol on November 7, 2007, and the robbery in San Leandro on May 8, 2007. It stated: "In those cases, five of the characteristics appear in all of them. There's a gas station; black/silver gun; the robber is alone, and he's described as Hispanic except for the Sebastopol case; a plastic bag was provided in each one of these situations; each one of the victims was ordered to get on the ground and count to 30. [¶] Alone or maybe one or two of these factors being involved, the Court would not be inclined to allow it in, but I think there are enough similarities to warrant the use of those two. And I think, again, balancing under 352, as I -- as the Court must, I don't think it's too cumulative. I don't believe it will be too time consuming, and I think in light of the similarities that the Court has just recounted that the probative value outweighs the prejudicial effect. So those are the two."

The prosecutor presented evidence that defendant committed robberies at gas stations in San Leandro and Sebastopol. The trial court instructed the jury that if the prosecution had proved by a preponderance of the evidence that defendant committed the uncharged offenses, the jury could, but was not required to, consider this evidence for the limited purpose of determining whether defendant committed the charged offenses.

After the jury found defendant guilty of counts one and two, he brought a motion for a new trial on several grounds, including the admission of the uncharged offenses. The trial court denied the motion.

## 2. Legal Analysis

"'Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' [Citation.] 'Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.]'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 667 (*Fuiava*).)

"'"[O]ther-crimes evidence is admissible to prove the defendant's identity as the perpetrator of another alleged offense on the basis of similarity 'when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses.' [Citation.]" [Citation.] The inference of identity, moreover, need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 856-857 (*Vines*), superseded by statute on another pont as recognized in *People v. Robertson* (2012) 208 Cal.App.4th 965, 981; see also *People v. Kipp* (1998) 18 Cal.4th 349, 369-370.)

"'When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.]'" (*Fuiava*,

*supra*, 53 Cal.4th at p. 667.) Moreover, the probative value of the uncharged offense must be weighed against the danger "of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"'"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." [Citation.]' [Citation.]" (*Fuiava*, *supra*, 53 Cal.4th at pp. 667-668.)

Defendant focuses on each factor that the trial court referred to in its ruling and argues that it was not unusual or distinctive. Relying on his own search of published appellate opinions, newspaper articles, and Federal Bureau of Investigation (FBI) statistics, he asserts that a gas station is a common venue for a robbery. He then notes that a black and/or silver gun is not distinctive and that U.S. Census Bureau figures in 2010 establish that 37.6 percent of Californians are Hispanic. He also relies on his case law search to argue that "plastic bags are standard robbers' equipment" and there is "nothing unusual about a robber's telling victims to get on the ground . . . ."[2]

Defendant's argument, however, fails to acknowledge that the trial court need not consider each factor in isolation. Factors of "'lesser distinctiveness may yield a distinctive combination when considered together.'" (*Vines*, *supra*, 51 Cal.4th at p. 857.) Here, the principle issue at trial was identity. The evidence of the charged and uncharged robberies involved the robbery of a gas station in which a male, acting alone, displayed a black/chrome semiautomatic and told the victim to put the money in a plastic bag. After ordering the victims to get on the floor and to count to 30, the robber left.[3] Moreover, the

---

[2] This court has previously denied defendant's request to take judicial notice of the FBI statistics and the percentage of the Hispanic population in California.

[3] Defendant points out that Adeli testified at the preliminary hearing that the robber told him to wait for five minutes on the ground. However, the prosecutor's motion to admit evidence of the uncharged offenses states that the robber told Adeli to count to 30. At the hearing on the motion, the trial court stated that it had not looked at any police reports or the preliminary hearing transcript and asked defense counsel if he wanted it to "take a look" at the prosecutor's summary of the charged offenses as "background."

robber was Hispanic in three of the four robberies.  The trial court could reasonably find that these common factors, when considered together, were very probative on the issue of identity.

Defendant also contends that the evidence of the uncharged offenses should have been excluded as more prejudicial than probative under Evidence Code section 352.  He argues that the evidence of the charged robberies was weak and the "stronger evidence that [defendant] had committed two uncharged robberies was calculated to, and did, shore up the weak evidence and result in convictions on the San Jose incident."

The "undue prejudice" referred to in Evidence Code section 352 "is not synonymous with 'damaging,' but refers instead to evidence that '"uniquely tends to evoke an emotional bias against defendant"' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)  This "'"evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citations.]'" (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

Here, evidence of the uncharged offenses was not more inflammatory than that of the charged offenses.  Thus, the trial court did not abuse its discretion in concluding the probative value of the evidence outweighed its prejudicial effect.  Moreover, if the jury's emotional reaction to the evidence of the uncharged offenses had been improper, it would have convicted defendant of both robberies.  That it acquitted defendant of the Los Gatos

Defense counsel had no objection and did not challenge the prosecutor's characterization of the facts of the Los Gatos robbery at any time during the hearing.  Based on this record, the trial court properly concluded that the perpetrator of the Los Gatos robbery told his victim to get on the ground and count to 30.

robbery showed that it considered the uncharged offenses for the limited purpose set forth in the trial court's instructions.

Defendant next argues that the evidence of the uncharged crimes violated his federal constitutional right to due process. The erroneous admission of other crimes evidence "results in a due process violation only if it makes the trial *fundamentally unfair.*" (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Since we conclude that the trial court properly exercised its discretion in concluding that the probative value of the relevant evidence outweighed its prejudicial effect, we find no due process violation.

### B.  Newspaper Articles on Mistaken Identification

Defendant also contends that the trial court abused its discretion in denying his request to read parts of newspaper articles on mistaken identification to the jury during closing argument.

Prior to closing argument, defense counsel requested permission to read parts of articles from two newspapers regarding mistaken identification. He stated:  "What I'd like to do, and my understanding is it's in the discretion of the Court and I have to request permission from the Court, is read certain parts of articles from the Mercury News and another article from the news regarding mistaken identification. I don't want to read the entire article. As a matter of fact, I have the parts highlighted I want to read and crossed everything else out, but I wanted to seek permission from the Court first and bring it to your attention before I did it."

The trial court asked defense counsel to provide "some detail on what the article purports to state or . . . perhaps you can give me a synopsis of the article." Defense counsel then stated:  "The first one is the Mercury News. It appears the reporter is Fredrick Tulsky, and essentially it's just a news article about a gentleman who was convicted in 2000 after being the masked intruder who allegedly robbed a 7-Eleven in Milpitas in 1998, hopped the counter, took money from the cash register. The clerk

identifies Hutchinson as the robber even though the clerk gives conflicting testimony to police officers. Then the attorney calls one defense witness and so forth. [¶] Then the other part of the article just states that a federal judge overturned the Milpitas man's robbery conviction citing persuasive independent evidence. That's one article. [¶] There's a bunch of other stuff in there, Judge, but I don't -- you know, I don't think it should be read at all."

Regarding the second article, defense counsel stated: "This is from, it looks like, Nature News. I pulled it from the internet here. This is an article written by Laura Spinney, and it talks generally about eyewitness identification and its problems and such. And the only relevant part I wanted to read to the jury here has to do with a gentleman who was arrested, Jerry Miller, for it says kidnap, rape, and robbery of a woman, but I could leave that out. I can leave out the kidnap and rape. All I care about is the robbery. [¶] And then after two eyewitnesses at the crime picked him out of a lineup and the victim identified him at the trial, he was convicted. He was convicted, and it says, sentenced to 45 years in prison. I can leave that out. I don't really want that. But then in March, 2007, the victim's clothing was subjected to DNA testing and found not to belong to him. His conviction was quashed a month later. Then it said he spent 24 years in jail, but I can leave that out, anything that has to do with sentencing, time in prison and such. That's pretty much all I would want to read, just to express a part of my argument how unreliable eyewitness identifications are."

The trial court denied the request on the basis that the defense had not presented any expert witness testimony on the reliability of eyewitness identification.

*People v. West* (1983) 139 Cal.App.3d 606 (*West*) discussed the two lines of authority as to whether counsel may read and/or use newspaper articles on matters of common knowledge during closing argument. (*West*, at p. 610.) *West* first referred to *People v. Guzman* (1975) 47 Cal.App.3d 380 in which the court stated that counsel should have been "'permitted to refer to magazine and newspaper articles reflecting

illustrations of incidents of misidentification, a matter of common knowledge.'
[Citation.]" (*West*, at p. 610.) *West* then noted that a contrary view was stated in *People v. Mendoza* (1974) 37 Cal.App.3d 717. *Mendoza* concluded: "'Counsel's summation to the jury must be based upon facts shown by the evidence or known judicially. [Citation.] Counsel may refer the jury to nonevidentiary matters of common knowledge, or to illustrations drawn from common experience, history, or literature [citation], but he may not dwell on the particular facts of unrelated, unsubstantiated cases.'" (*West*, at p. 611.)

This court followed the *Mendoza* line of cases in *People v. London* (1988) 206 Cal.App.3d 896. In *London*, the trial court denied defense counsel's request to refer in closing argument to a magazine article that reported an incident in which an eyewitness erroneously identified a district attorney as the perpetrator of a crime. This court concluded that "the trial court properly excluded hearsay about a particular, alleged instance of misidentification which had nothing to do with the case before it." (*Id.* at p. 909) However, *London* also noted that the trial court permitted defense counsel to "'say that in general, that there are repeated instances [of mistaken identity] in magazines.'" (*Ibid.*)

"[W]hether a particular newspaper or magazine article should be read to the jury, is a matter that is addressed to the sound discretion of the trial court. [¶] In exercising that discretion, the trial court should read the newspaper article and consider whether it relates to matters of common knowledge or substantiated illustrations of common experience, whether the article is relevant to the case and whether the article may confuse the issues in the case. [Citation.]" (*West*, *supra*, 139 Cal.App.3d at p. 611.)

Here, under *People v. London*, *supra*, 206 Cal.App.3d 896, the trial court could have properly exercised its discretion to deny defense counsel's request to the extent that he sought to refer to the specific facts of unrelated cases, but this was not the basis for the trial court's ruling. The trial court denied the request on the ground that there had been no expert testimony on misidentification, and thus it did not consider whether some

portions of the articles were related to matters of common knowledge or whether the articles might confuse the issues in the case. However, the error was harmless. Here, defense counsel cross-examined the witnesses about the discrepancies in their identification. He also emphasized during argument the witnesses' inability to correctly identify defendant and suggested to the jury why Hernandez's identification was unreliable. Thus, even if defense counsel had been allowed to read the portions of the newspaper articles that referred to matters of common knowledge, it is not reasonably probable that the result would have been more favorable to defendant. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

### C.  Sentencing

Defendant contends, and the Attorney General concedes, that he is entitled to:  (1) presentence credits that had previously been awarded in the Sonoma County case, and (2) custody credits for the period between the date of his sentencing hearing in Sonoma County and the date of his sentencing hearing in the present case.

When defendant was sentenced in the present case, he was serving a prison term of three years for a robbery conviction in Sonoma County as well as a 10-year term for a firearm use enhancement. The trial court reimposed these terms and then imposed consecutive terms of one year on count one and eight months on count two. The trial court also imposed a term of three years and four months for the firearm use enhancement on count one and stayed the term for the firearm use on count two. The trial court did not award any presentence credits, because it concluded that presentence credits were attributable to the Sonoma County case.

"If a determinate sentence is imposed under section 1170.1 (a) consecutive to one or more determinate sentences imposed previously . . . in other courts, the court in the current case must pronounce a single aggregate term . . . ." (Cal. Rules of Court, rule 4.452.) *People v. Saibu* (2011) 191 Cal.App.4th 1005 (*Saibu*) held that when a trial court

resentences a defendant to a single aggregate term pursuant to California Rules of Court, rule 4.452, it has modified the sentence for purposes of section 2900.5,[4] and thus the defendant is entitled to presentence credits for time that he has already served. (*Saibu*, at p. 1012.) Here, since the trial court imposed a single aggregate term for both the present case and the Sonoma County case, defendant is entitled to 486 days of presentence credits that were awarded in the Sonoma County case.

As in *Saibu*, since defendant served part of his sentence in the Sonoma County case before he was sentenced to a single aggregate term in the present case and the prior case, the trial court is required to award custody credits for the time that he served between the date of his original sentencing on January 6, 2009, and the date of his resentencing on June 17, 2011. (*Saibu*, *supra*, 191 Cal.App.4th at p. 1012.) He is also entitled to conduct credits for that period, which are calculated by the Department of Corrections and Rehabilitation. (*Id.* at p. 1013, fn.9.)

The Attorney General argues that the trial court unlawfully stayed the firearm enhancement on count two. We agree.

"Ordinarily, an enhancement must be either imposed or stricken 'in furtherance of justice' under Penal Code section 1385. [Citations.] The trial court has no authority to stay an enhancement, rather than strike it—not, at least, when the only basis for doing either is its own discretionary sense of justice." (*People v. Lopez* (2004) 119 Cal.App.4th 355, 364.) "The terms 'stay' and 'strike' are not legally synonymous. [Citation.] A stay is a temporary suspension of a procedure in a case until the happening of a defined contingency. [¶] In contrast, a striking is an unconditional deletion of the legal efficacy of the stricken allegation or fact for purposes of a specific proceeding. It is tantamount to

---

[4]     Section 2900.5, subdivision (b) provides: "For the purposes of this section, credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted. Credit shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed."

a dismissal." (*People v. Santana* (1986) 182 Cal.App.3d 185, 190, fns. omitted.) "The failure to impose or strike an enhancement is a legally unauthorized sentence subject to correction for the first time on appeal. [Citations.]" (*People v. Bradley* (1998) 64 Cal.App.4th 386, 391.)

Since the stay of the firearm enhancement on count two constitutes an unlawful sentence, the matter must be remanded for the trial court to exercise its discretion to either impose or strike the enhancement. In the event that the trial court strikes the enhancement, it must set forth its reasons in the minutes. (*People v. Superior Court* (*Pipkin*) (1997) 59 Cal.App.4th 1470, 1477.)[5]

### III. Disposition

The judgment is reversed and the matter is remanded for resentencing.

---

[5] Defendant points out that the abstract of judgment bears only the Santa Clara County case number and thus it must be corrected to reflect: (1) the trial court imposed the 18-year term for both the Sonoma County case and the present case, and (2) the abstract of judgment filed in Sonoma County is superseded by the amended abstract. He also notes that the amended abstract should: (1) specify that the conviction in Sonoma County was for second degree robbery (see § 213 [only second degree robbery has a midterm of three years]), and (2) cite section 211, rather than section 21, in connection with the robbery count in the present case. These corrections must be made to the abstract of judgment.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Márquez, J.