Filed 5/8/14  P. v. LeBlanc CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KEM L. LEBLANC,<br><br>        Defendant and Appellant. | A134710<br><br>(San Francisco County<br>Super. Ct. No. SCN216218) |

Kem LeBlanc appeals from convictions of robbery, assault and grand theft.  He contends his convictions must be reversed because the trial court erroneously admitted evidence that at the time of his arrest he was found in possession of items belonging to a person unrelated to the charged counts, his attorney rendered ineffective assistance of counsel in failing to object to police testimony that he was in possession of marijuana at the time of his arrest and that he invoked his *Miranda*[1] right to silence on two occasions, and the trial court erred in instructing the jury on flight from the scene of the crime.  We affirm.

**STATEMENT OF THE CASE**

Appellant was charged by information filed on August 22, 2011, with four offenses arising out of an incident on July 23, 2011, and one offense committed on  July 17, 2011.  Count 1 charged appellant with the second degree robbery of Unique Martin

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

1

on July 23 (Pen. Code, § 211[2]), with special allegations that appellant committed the offense while on parole (§ 1203.085, subd. (b)), personally used a deadly weapon (§ 12022, subd. (b)(1)), and inflicted great bodily injury (§ 12022.7, subd. (a), and § 1203.075, subd. (a).)  Count 2 charged appellant with assault with a deadly weapon (§ 245, subd. (a)(1)), with special allegations that appellant committed the offense while on parole (§ 1203.085, subd. (b)) and inflicted great bodily injury (§ 12022.7, subd. (a)). Count 3 charged appellant with assault with a stun gun (§ 244.5, subd. (b)).  Count 4 charged misdemeanor possession of a stun gun after having been convicted of a felony (former § 12651, subd. (a) [now § 22610, subd. (a)]).  Count 5 charged appellant with misdemeanor grand theft (§ 487, subd. (a)) from the Opal Hotel on July 17.  It was also alleged that appellant had previously served a separate prison term (§ 667.5, subd. (b)) after having been convicted of grand theft person (§ 487, subd. (c)) in 2009.

On October 25, 2011, during the jury selection phase of trial, appellant pled guilty to count 4, the misdemeanor charge of being a felon in possession of a stun gun, and admitted (subject to his being convicted of one of the substantive offenses) being on parole at the time of the alleged robbery.

After presentation of the evidence to the jury, the court granted the prosecutor's motion to amend count 5 to charge theft (§ 484) rather than grand theft.

After trial, on November 4, 2011, the jury found appellant guilty of counts 1, 2, 3 and 5, and found true the special allegations associated with counts 1 and 2.  On January 27, 2012, appellant was sentenced to a seven-year prison term.

Appellant filed a timely notice of appeal on February 6, 2012.

### STATEMENT OF FACTS

**<u>Robbery of Unique Martin</u>**

Unique Martin testified that at 5:00 a.m. on July 23, 2011, she got off work at the Market Street Cinema on Seventh and Market Streets in San Francisco and began her bus

---

[2] All further undesignated statutory references are to the Penal Code.

2

trip home. She was carrying her black purse and a bag containing shoes she had gotten earlier in the day. In her handbag she had her dancing shoes and something from Victoria's Secret, as well as a clutch containing her money. She had $117—one $20 bill and the rest ones—from tips she had made at work.

While sitting waiting for a bus on San Bruno and Bacon, Martin was listening to her ipod with her head down, using twitter on her cell phone. Noticing some feet, she looked up, saw a person she identified as appellant approaching her with a knife, and jumped up. Appellant put the knife to her throat and told her he would cut her throat open if she screamed. He also held a black taser in his left hand to the side of her throat. She shoved him and grabbed for the knife with her left hand; in the struggle, her hand was cut and they both fell to the ground. Martin testified that her assailant was bigger and heavier than her. Her hand was bleeding a lot; there was blood everywhere, including her clothes and phone.

Appellant grabbed Martin's bag and purse and walked away. She followed him, calling 911 as she did so. She identified a recording of her call to 911, a transcript of which was entered into evidence. She lost sight of appellant around a self-storage facility. Martin testified that appellant was wearing baggy blue jeans and white button-up shirt with stripes, and that his hair was "like a little afro." During the 911 call, she described him as a black male in his mid-20's, five foot three inches tall and of medium build, wearing a white button-up shirt and blue jeans. She testified that at the time of the call, she was not thinking about height, only that she needed the police to get there. She told the officers who responded to the scene that the suspect was a black male, five feet three inches tall, medium build, with a "fade"[3] haircut and wearing a white button-up shirt. Martin testified that she was five feet six inches tall. The parties stipulated that appellant is six feet one inch tall.

---

[3] Martin described a "fade" as a very short haircut with "basically no hair on your head." Officer Matthew Balzarini described it as a haircut going "from shorter to longer," "[t]ight on the sides."

3

After medics arrived at the scene, Martin was taken to the hospital and received 24 stitches on her hand. While at the hospital, the police brought a suspect they asked her to identify from across the street, and she immediately knew it was the person who robbed her. She noticed that he was wearing a black shirt, not the white one he had been wearing before. She testified that she had particularly noticed the white button-up because it seemed odd clothing for 6:00 a.m. Martin acknowledged that it was only after viewing appellant outside the hospital that she modified her description to say her assailant was heavyset. She also testified, however, that she told the first officers at the scene that he was heavier or bigger than her.

The police located a surveillance camera in the area where the incident occurred and, at trial, Martin was shown a surveillance video taken by this camera. She recognized the person in the video as the person who attacked her, testifying that although she could not see his face, she recognized the white button-up shirt and her purse. Martin acknowledged that at the preliminary hearing she said the white button-up shirt had blue stripes. Still photos taken from the video, depicting a male in dark pants and a white shirt, walking and carrying a dark bag, bore time stamps of 5:59 a.m.

Officer Jonathan Lucchetti, one of the first officers to arrive at the scene, testified that he and his partner found Martin in the middle of the street at the intersection of Egbert and Newhall. Martin described her assailant to Lucchetti and his partner, as well as Officer Balzarini, who arrived at the scene, as a black male, 24-25 years old, wearing a white button-up shirt and blue jeans, with a fade haircut. The description was broadcast, and other officers searched the area for the suspect. After Martin was taken to the hospital, Lucchetti found a size large white tee shirt with blood on it on the sidewalk, mid-block on Egbert. It was never determined whether this shirt had any relation to this case.

Looking for the suspect, Officer Stephen Gritsch and his partner searched an area by train tracks, including a vacant lot and a storage locker yard at 1700 Egbert, which they searched after getting permission from a man in an upper unit next to the yard. The

4

description they had been given of the suspect was a black male, about five feet three inches to five feet four inches, in a white button-up shirt.  At about 6:13, while in the yard, Gritsch or his partner broadcast seeing a black male in a white shirt and black cap walking eastbound on Williams, just over the tracks.  Gritsch saw police cars drive up next to this person but did not know what interaction occurred.  He heard someone broadcast, "not him."  Gritsch and his partner found no one in the yard and returned to the station, then received a call from the man at 1700 Egbert, who reported seeing a black male wearing a black tee shirt and blue jeans jump through a fence and cross the train tracks.

Eric Heckenlaible lived and worked at 1700 Egbert, a self storage facility with an apartment above the office.  At about 6:15 or 6:30 on the morning of July 23, 2011, Heckenlaible was woken by the sound of vehicles and voices outside; he looked out his open window and saw two patrol cars and an officer looking over the guardrail at the dead-end of his street.  An officer asked if Heckenlaible had seen anyone, which he had not.  Heckenlaible and Richard Sherman, his roommate, testified that the police described the suspect as a black man with a black shirt or black hoodie.  After the police left, at about 6:40 or 6:45 a.m., Heckenlaible and Sherman noticed an African American man in a black tee shirt walking toward the dead-end of the street.  When the man reached the dead end, he appeared "almost frantic," looking over his shoulders toward the other end of the street and studying the fencing, then climbing the fence, crossing the railroad tracks and climbing a secondary fence to get to Carroll and Third Street.  Sherman noted that while people crossing the fence usually stand and wait to see if there is a train coming, this person just hopped the fence and ran across the tracks.  Concluding this was probably the suspect, they called 911.

Officer Gritsch and other officers drove to the area of Carroll and Third Street where Heckenlaible and Sherman  reported seeing the man cross the fences.  After confirming the description the callers had given, Gritsch saw a person who fit the description, and whom he identified in court as appellant, walking toward Third and

5

Carroll, sweating a lot. The officers contacted and searched appellant, finding a large wad of one dollar bills, a small baggie of marijuana and a wallet in his right front pocket and a black taser in his left front pocket. There were also some one dollar bills in his back pocket. The police did not find a knife, a lady's purse, a bag from a shoe store or women's shoes, a white button-up shirt or a white button-up shirt with blue stripes. Neither Gritsch nor Balzarini knew how the men at the storage yard came to be told to look for a black male with a black hoodie.

Heckenlaible and Sherman were taken in separate cars, to identify the suspect. Heckenlaible recognized him, noting that he was wearing a dark tee shirt and dark pants with distinctive silver and white embroidery on the back pockets; he testified that the pants in evidence at trial had the embroidery he observed. At the identification, Heckenlaible said the man's hair did not look exactly the same as what he had seen, the shirt had fit more closely to his body and was not as faded, and the design on the pants was not as bold, but the body type was definitely the same. He testified that he was certain this was the person he had observed climbing over the fence. Sherman identified the man based on the specific pattern on the back of his pants and the length of his hair.

Balzarini took appellant to the hospital and had Martin come outside to identify whether this was her assailant, after admonishing her that the person she would see might or might not be the perpetrator and she should not assume it was. Appellant was in handcuffs and Martin viewed him from a distance of 40 feet. She said, "Yes. That's him. I'm a hundred percent sure that's him. Oh my God." Appellant was arrested and taken to the police station, where the property found in his possession was booked into evidence. The cash in appellant's pocket amounted to $165, consisting of four $20 bills, one $5 bill and eighty $1 bills. The wallet contained a social security card and a birth registration card, both in the name Jameson Tyler, and a Clipper transit card. The marijuana in appellant's possession weighed 1.7 grams. When arrested, appellant was wearing a black tee shirt, size extra large, gray jeans with white stripes on the back pockets and black sneakers with white soles. His hair was not in a fade haircut.

6

Prior to appellant's arrest, Officer Balzarini had not heard any mention of a taser with regard to this incident. He testified that Martin suddenly recalled a taser when he was talking with her at the hospital at about 7:30 or 7:45 a.m. Martin acknowledged that she told the police about the taser for the first time at the identification at the hospital; she had not mentioned the suspect having a stun gun to the 911 operator, the police at the scene, the ambulance attendants or the personnel at the hospital. A couple of days after the incident, when she was being interviewed by Sergeant Daniel Cole, Martin did not initially mention the stun gun while describing the incident; it was only after he asked about the stun gun that she said something to the effect of "oh, yeah." Martin told Sergeant Cole that she remembered the stun gun, but at the time of the incident she had been more focused on the knife. She described the suspect to Cole as having a "big build."

Cole spoke with appellant at the county jail on July 25, 2011. Appellant said he wanted to speak with Cole about the incident but wanted to consult an attorney first. After Cole turned off the tape recorder, as he was leaving, appellant spontaneously said, "She is lying. I only attempted. That is different than actually doing it." Cole recorded this statement in his report on the day it occurred.

Martin's property was never recovered and the police never located a white button-down shirt.

Opal Hotel Theft

At about 10:00 p.m. on July 17, 2011, Jennie Armenta was working at the front desk at the Opal Hotel on Van Ness Avenue. A man she described as African American, in his 20's or 30's, about five feet six or seven inches tall, with some facial hair, wearing a beanie and puffy sweater and carrying a backpack, asked if they had a business center, and she directed him to it. He returned 5 or 10 minutes later, said the computers were not working, and asked if there was another computer he could use. This was not an unusual occurrence for guests, so she let him use the computer in the back office after closing out the password-protected programs related to the hotel. She returned to the front desk, then

7

returned to check on the man after 5 or 10 minutes and saw that he was on Facebook. Adela Ciubara arrived for her shift as night auditor at the hotel and went into the back office to leave her purse and plug in her laptop; all the employees kept their belongings in the back office. Armenta had told her there was a guest using the computer in the office, and Ciubara saw that he was on Facebook. She testified that the man was "big" and had a thin goatee.

Ciubara returned to the front desk and about 10 minutes later, the man came out of the office, said "thank you" and left. Ciubara went to the office for some papers and noticed her computer charger on the floor and her computer gone. Her iphone was also missing from her purse, and Armenta's wallet, containing her identification cards and $150, was also gone.

The police were given the hotel video and a print out of the Facebook page that had been left open on the office computer, as well as the e-mail address KemLeblanc87@Yahoo.com. Based on this information, they identified appellant as the person involved in the incident. A few days later, Ciubara and Armenta each identified appellant in photographic lineups. Ciubara also identified him on the hotel's surveillance video.

### Defense

Psychologist Mitchell Eisen, testifying as an expert witness, stated that memory reports given right after an experience tend to be more complete, detailed and accurate than ones given after a period of time. Trauma can affect memory because it is distracting, with attention focused on what is "core to surviving the event." Where a weapon is involved, focus on the weapon often results in not processing other information as well. Taking time to gather thoughts about a traumatic event will not result in improved memory. Eisen testified that false identification rates are higher with single show-ups than with lineups. When a witness is interviewed multiple times, minor additions or omissions from one report to the other are to be expected, but major changes in the stories would suggest inaccurate memory. Once a person makes an identification,

8

this becomes the memory and it is very rare for that person to change their decision. In-court identifications are not a reflection of memory but an assertion of what the witness has come to believe based on prior recognition. A witness's confidence in his or her identification is not a good predictor of actual accuracy.

San Francisco Public Defender's investigator Gary Sourifman accompanied defense counsel to interview Martin on September 22, 2011. He testified that in her description of the events, Martin never mentioned a taser. She did say she had an old cell phone in her purse that night.

## DISCUSSION

## I.

As described above, the evidence showed that when appellant was arrested, he had in his wallet a social security card and birth registration card in the name of Jameson Thomas Tyler. He contends the trial court erred in allowing this evidence that he was in possession of items belonging to another person unrelated to the offenses for which he was on trial.

In the trial court, the defense moved to exclude any reference to these items. The prosecution did not want to introduce the cards themselves but only to elicit the testimony that they were in appellant's possession. The prosecutor explained that these cards, as well as a Clipper card with no name on it, were found in appellant's possession upon his arrest; the officer who discovered them traced them to Mr. Tyler, to whom they were released after he identified them as his. According to a police report that was not provided to defense counsel until the first day of trial, on July 21, 2011, Tyler was walking on Cole Street toward Frederick when a black man turned in front of him and asked for directions. Tyler indicated he was not able to help and kept walking, then turned and saw the man behind him. Tyler backed into an entryway and felt a sharp object poking his stomach. The man told Tyler not to resist and asked for his wallet and iphone. Tyler described the man as 35 to 40 years old, heavyset, 250 to 300 pounds, with a goatee and wearing dark pants that looked like sweatpants.

9

In discussing the motion, the prosecutor stated that she sought, at a minimum, to introduce testimony that the three cards were found in appellant's possession when he was arrested, but urged that because of the similarity between the Tyler and Martin incidents, and proximity in time, evidence of the Tyler incident was admissible as showing modus operandi and therefore identity. Defense counsel argued that the prosecution had not timely raised the issue, having provided the police report only the day before; that appellant's possession of the cards was not relevant to the issue of identity in the present case; and that evidence of another theft-related incident would require bifurcation because it would be too prejudicial. The court saw a basis for admission under Evidence Code section 1101, subdivision (b), as to count 5, because the items taken from the Opal Hotel included identity cards, but noted that it would have to conduct an analysis under Evidence Code section 352 before concluding the evidence was admissible and stated that it would conduct an Evidence Code section 402 hearing on the matter later. The defense argued that the court would have to consider in its analysis the prejudicial effect on the felony counts of evidence that was being admitted as relevant to the misdemeanor count, and the court agreed.

Later, the prosecutor sought to introduce through Officer Balzarini's testimony, the fact that these cards were in appellant's possession when he was apprehended. Presented in this "narrow fashion," the court did not view this as an issue under Evidence Code section 1101, subdivision (b), as "[t]here could be many explanations as to why a person would have cards in his possession that . . . contain the name of someone else" that are not necessarily indicative of bad conduct but are "simply circumstances of his arrest that occurred on July 23." The court found this "very limited testimony" admissible under Evidence Code section 352 as it would not involve undue consumption of time and the probative value was not outweighed by prejudicial effect. Asked by defense counsel what legitimate reasons there might be for someone having someone else's identity cards in their possession, the court said it would leave this to the defense

10

and reiterated that it did not see this as a question of Evidence Code section 1101, subdivision (b), bad conduct.

The court went on to say, however, that if it did consider it a question under Evidence Code section 1101, subdivision (b), it would find the fact of the cards being in appellant's possession admissible, with the prejudicial effect not exceeding the probative value "for the reasons stated by the district attorney earlier this morning." In the earlier discussion, however, the prosecutor had addressed the probative value not of the cards alone but of the underlying Tyler incident on modus operandi, and had not responded to the defense arguments on prejudice. Finally, the court stated that while it was not being asked to admit evidence of the circumstances of the Tyler incident, and would not do so because the prosecution had not timely provided the incident report to the defense and identified Tyler as a witness, if the prosecution had acted in timely fashion, the evidence would meet the requirements for admission to show motive and similar conduct and the court would find the evidence more probative than prejudicial under Evidence Code section 352.

Viewing the evidence that he was in possession of two identification cards in another person's name as evidence of an uncharged offense, appellant contends it was inadmissible because it was irrelevant, did not fall within the parameters of Evidence Code section 1101, subdivision (b), and was more prejudicial than probative. We need not determine the merits of this contention, however, as any error in admitting the evidence was clearly harmless.

The evidence of appellant's possession of the cards was not admitted as evidence of a prior offense: The jury was offered no explanation of how he came to be in possession of the cards and no focus was placed upon them, they were simply among the items listed as having been in his possession when he was searched upon his arrest. No other reference was made to the cards during the trial; they were not referred to in closing arguments and the jury was never asked to draw any inference from them. To the contrary, the overwhelming focus at trial was on the identification of appellant as the

11

perpetrator of the offenses against Martin—the discrepancies between her contemporaneous description of her assailant and appellant's actual appearance and questions about details in her account that changed over time. Any effect on the jury of the evidence of the cards in appellant's wallet—had the jury even thought to infer a prior theft offense from the brief mention of the cards—would have paled by comparison to the evidence of appellant's conceded theft from the Opal Hotel. Given appellant's commission of that theft, it is all but unimaginable that a jury not otherwise convinced of appellant's commission of the offenses against Martin would have been swayed to convict by the evidence of his possession of these identity cards.

Appellant argues that the evidence against him was "sparse," noting the discrepancy between Martin's initial descriptions of the assailant and appellant's actual appearance and the fact that no physical evidence tied appellant to the offenses except his possession of a taser, which Martin did not mention in her initial reports of the crimes.[4]

---

[4] Appellant argues that Martin first mentioned the taser when she was interviewed by Sergeant Cole a few days after the attack, and that Cole admitted she mentioned the taser only after being made aware that appellant had such a weapon in his possession at the time of his arrest. The record citations appellant provides for these points do not support his characterization. At these pages in the reporter's transcript, Martin acknowledged that she did not mention the taser to the 911 operator, the officers who responded to the scene, or medical personnel, that she mentioned it for the first time "when Officer Balzarini is now at the hospital with you" at about 7:30 a.m. on the morning of the attack, and that when interviewed by Cole, she mentioned it only after he asked her, "what about the stun gun"; Officer Balzarini testified that he first heard mention of a taser after appellant's arrest and that when he was at the hospital with Martin she "suddenly" recalled a taser; and Sergeant Cole's testimony that he asked Martin about the stun gun "at one point" in his interview, and that he became aware through the testimony at trial that the first time the taser was mentioned was "after Officer Balzarini becomes aware of the taser at the arrest and then goes to the hospital and speaks with Ms. Martin and suddenly she recalls a taser." Thus, contrary to appellant's characterization, the evidence established that Martin first mentioned the taser to Officer Balzarini at the hospital on the day of the attack, not in her subsequent interview with Sergeant Cole, and none of the testimony appellant cites refers to Martin being "made aware" that appellant had a taser in his possession before she mentioned the

But all these discrepancies were discussed and debated at length at trial, and the defense attempted to undermine Martin's identification through the testimony of its expert on eyewitness testimony. The jury saw the video that Martin testified depicted her assailant and her purse and was able to compare the person depicted with appellant as he sat before them. Appellant was found in possession of a large wad of single dollar bills, albeit not the precise number Martin said she had been carrying. Appellant also admitted some complicity in the offense when he told Sergeant Cole, "She is lying. I only attempted. That is different than actually doing it." The evidence against appellant was far stronger than he attempts to portray it.

## II.

Appellant next contends he received ineffective assistance of counsel due to his attorney's failure to object to evidence that he had marijuana in his possession when he was arrested and invoked his *Miranda* rights on two occasions.

"Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694; *In re Wilson* (1992) 3 Cal.4th 945, 950.) A 'reasonable probability' is one that is enough to undermine confidence in the outcome. (*Strickland v. Washington, supra,* 466 U.S. at p. 694; *In re Jones* (1996) 13 Cal.4th 552, 561.)" (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541.)

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel (see *People v. Wright* (1990) 52 Cal.3d 367, 412), and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' (*Strickland v. Washington*[*, supra,*] 466 U.S.

---

weapon. The record does confirm that Martin did not mention the taser in her first reports on the night of the attack, and did not mention it in her initial description to Cole.

13

[at p.] 689 . . . .) Defendant's burden is difficult to carry on direct appeal, as we have observed: ' "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.

## Marijuana evidence

One of the incriminating circumstances in this case was that appellant was found in possession of a large number of one dollar bills, while Martin testified that a large number of one dollar bills she had earned in tips was stolen from her. Appellant argues that defense counsel tried to establish, as an alternative explanation for his possession of the dollar bills, that he had been selling marijuana—but did so incompetently.

Toward the end of its case, the defense sought to admit evidence of a conversation between appellant and Officer Gritsch on July 23, 2011, in which appellant said something to the effect of, "[y]ou would have got me on it again now, but I sold it all last night downtown," Gritsch responded, "You must make decent money selling marijuana," and appellant replied, "Yeah, maybe $500, but that's all I'm gonna say about it. You're cool, but I don't want to incriminate myself." The court considered and rejected three bases for admitting this evidence: It found the statements inadmissible as declarations against interest because appellant was not unavailable as a witness; inadmissible as a prior inconsistent statement because appellant did not testify; and inadmissible under Evidence Code section 356 (allowing inquiry into the whole of a subject where the opposing party has presented evidence of part of an act, declaration, conversation or writing) because the proffered statements were made two days before the statement attributed to appellant by Sergeant Cole (that appellant "attempted" to rob Martin) and did not concern the same subject matter. Appellant now argues that none of his attorney's theories of admissibility were valid and, because there was no basis for counsel to have thought they were, counsel's failure to object to testimony about appellant's possession of marijuana amounted to ineffective assistance of counsel.

14

Defense counsel did not fail to object to the evidence of appellant's marijuana possession. He affirmatively elicited the testimony. On direct examination, when asked what items were seized in the search when appellant was arrested, Officer Balzarini testified, "There was cash, there was a stun gun, a wallet, I believe that's it." On cross examination, defense counsel asked whether marijuana was found when appellant was searched and Balzarini responded, "Yes." After eliciting Balzarini's testimony that the marijuana was booked, defense counsel asked why Balzarini had not brought the marijuana to court, and Balzarini stated that he had not been instructed to do so and thought all the evidence would be there. One possible tactical purpose for defense counsel's questions could have been to discredit Balzarini's credibility. While appellant urges there is no basis for attributing such a purpose, the very tone of counsel's questioning suggested that Balzarini was trying to hide the fact of the marijuana possession: Not only did the defense raise the subject after Balzarini failed to mention the marijuana on direct, once Balzarini said he had not brought the marijuana to court because he was not instructed to, defense counsel asked, "Were you told you were going to be presenting items that were seized from the defendant?" and Balzarini replied, "yes." Defense counsel asked, "And did someone tell you to not bring the marijuana?" and when Balzarini said "[n]o," counsel asked "So you just elected not to bring it?"

In his reply brief, appellant switches from arguing that defense counsel failed to object to the marijuana evidence to arguing that counsel's introduction of evidence of the marijuana was an unreasonable tactic because counsel did not have a viable means of introducing evidence to support a theory that appellant had the money in his possession as a result of selling marijuana. But this was not necessarily the case. Perhaps counsel had other ideas for how to bring in such evidence. Perhaps it was still an open possibility that appellant would take the stand. As we have indicated, our review of counsel's conduct is deferential: " 'It is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a

15

particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.]' " (*In re Jones, supra,* 13 Cal.4th at p. 561, quoting *Strickland v. Washington*, *supra,* 466 U.S. at p. 689.)

Moreover, there was little chance of prejudice from the evidence that appellant possessed a small amount of marijuana when he was arrested. While a theory of defense based on the marijuana was not in fact developed and presented to the jury, neither was any theory presented by the prosecution to capitalize on the any potential incriminating effect of the evidence. Aside from describing the items seized in the search upon appellant's arrest, no reference was made at trial to appellant's possession of a small amount of marijuana. Certainly there was no suggestion appellant was a drug addict. (See *People v. Cardenas* (1982) 31 Cal.3d 897, 906-907 [evidence of defendant's narcotics addiction improperly admitted to show motive for robbery not involving narcotics; prejudicial effect of lengthy testimony on degree of addiction outweighed " 'remote[]' " probative value].) There is no reasonable likelihood the jurors, if otherwise unconvinced of appellant's guilt, would have been swayed to convict by the knowledge that he had a small amount of marijuana on his person when he was arrested.

**Invocation of *Miranda* rights**

Appellant also bases his claim of ineffective assistance of counsel on his attorney's failure to object to evidence that he invoked his right to remain silent when he was arrested for the Martin robbery and with respect to the hotel theft. Comment upon a defendant's exercise of the right to remain silent after *Miranda* warnings is impermissible because "it is fundamentally unfair to use post-*Miranda* silence against the defendant at

16

trial in view of the implicit assurance contained in the *Miranda* warnings that exercise of the right of silence will not be penalized." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 64-65.)

As indicated above, Sergeant Cole testified on direct examination that he took a tape recorder with him when he went to interview appellant on July 25, but appellant did not speak to him about the incident. After Cole turned the recorder off, as he was leaving, appellant spontaneously stated, "She is lying. I only attempted. That is different than actually doing it."

On cross-examination, defense counsel asked if Cole had given appellant *Miranda* warnings immediately upon meeting with him at the jail. Cole testified that he first told appellant who he was and that he was going to record the interview, and asked if appellant wanted to talk to him about what had happened. Defense counsel asked if appellant said at this point that he wanted to speak with an attorney and Cole said "[n]ot at that point;" counsel asked, "During the *Miranda*?" and Cole responded that after he gave appellant the *Miranda* admonitions, appellant said he wanted to speak with Cole but should consult an attorney first. In response to counsel's further questions, Cole testified that he turned the recorder off and packed up his things, appellant repeated what he had said on tape about wanting to speak to Cole but wanting to speak to an attorney first, and Cole said, "Okay, give me a call afterwards." As he was leaving, appellant made the spontaneous statement.

Concerning the hotel theft, Sergeant Tracy Boes testified on direct examination about identifying appellant as the perpetrator and about the items taken. On cross examination, defense counsel asked if Boes attempted to interview appellant and, when she said yes, asked, "Did he invoke his Miranda rights?" Boes testified that appellant said he did not want to speak with her, defense counsel asked if he made any spontaneous statements, and Boes replied that he did not.

In closing argument, defense counsel told the jury that the defense was "not disputing" the petty theft charge, and said, "You didn't see me ask any questions. The

17

only questions I want to ask you out of that case was if he needs spontaneous statements off the tape recorder like he allegedly made to Sergeant Cole? Answer was, no." Later, defense counsel challenged the credibility of Cole's testimony about appellant's spontaneous statement: "[He] makes one spontaneous statement, but not another when he's charged with these crimes. And again, Sergeant Cole had reviewed all the evidence when he went to go get a statement and realized the problems that they had in the case. So now all of a sudden we have this unrecorded—how does somebody invoke their right to Miranda, 'Okay, thank you, sir.' 'Oh, by the way, I did it. I could have attempted,' which in itself is ludicrous, because she was robbed, there was no attempt."

As should be clear from the above description, defense counsel did not fail to object to reference to appellant's invocation of his *Miranda* rights but, as with the marijuana evidence, affirmatively elicited the testimony. His reason for doing so seems apparent from his closing argument, in which he attacked Cole's credibility by pointing out that appellant made no spontaneous statement after asserting his right to silence in the hotel case. Appellant's argument that defense counsel failed to juxtapose appellant's different responses in the two cases ignores the portion of closing argument just described. It appears defense counsel made a tactical decision to challenge the credibility of Cole's testimony about appellant's spontaneous incriminating statement. Considering the incriminating effect of Cole's testimony, appellant has not demonstrated that counsel's strategy was outside " 'the wide range of reasonable professional assistance.' " (*People v. Lucas, supra,* 12 Cal.4th at p. 437, quoting *Strickland v. Washington*, *supra,* 466 U.S. at p. 689.)

## III.

The trial court instructed the jury pursuant to CALCRIM No. 372 as follows: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." Appellant contends this instruction was

18

improper as to the robbery charge because it is not to be given in a case where identity is at issue and because there was no evidence appellant attempted to flee when detained by the police, and that the trial court failed to specify that the instruction applied to the theft charge alone.

Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

Appellant's primary argument is that the flight instruction was erroneously given because his identity was the critical question with respect to the Martin robbery—that the instruction could have allowed the jury to infer his guilt from the fact that the assailant walked away from the scene of the robbery without separately determining that appellant was in fact the assailant. The perpetrator's leaving the scene, however, had no bearing on Martin's identification of appellant as her assailant; her identification was based on her observations at the time of the offense and her subsequent view of appellant at the hospital. The evidence of flight that the prosecutor urged the jury to consider was not the perpetrator's walking away from Martin after the assault and robbery, but the flight that Sherman and Heckenlaible observed. Their observation of the man crossing the fences and tracks, appearing "almost frantic" and running across the tracks without looking to see if a train was coming, prompted them to notify the police, who had informed them they were searching for a suspect, and they were able to confirm that appellant was the person they had seen crossing the tracks and fence.

"If there is evidence identifying the person who fled as the defendant, and if such evidence 'is relied upon as tending to show guilt,' then it is proper to instruct on flight.

19

(§ 1127c.) 'The jury must know that it is entitled to infer consciousness of guilt from flight and that flight, alone, is not sufficient to establish guilt. ([] § 1127c.) The jury's need to know these things does not change just because identity is also an issue. Instead, such a case [only] requires the jury to proceed logically by deciding first whether the [person who fled] was the defendant and then, if the answer is affirmative, how much weight to accord to flight in resolving the other issues bearing on guilt. The jury needs the instruction for the second step.' " (*People v. Mason* (1991) 52 Cal.3d 909, 943, quoting *People v. London* (1988) 206 Cal.App.3d 896, 903.) "[A] flight instruction is correctly given 'where there is substantial evidence of flight by the defendant apart from his identification as the perpetrator, from which the jury could reasonably infer a consciousness of guilt.' (*People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1476, italics omitted.)" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1245; see, *People v. Batey* (1989) 213 Cal.App.3d 582, 587.)

*People v. Simon* (1989) 208 Cal.App.3d 841 explains and illustrates the point. There, witnesses observed a person identified as the defendant commit an assault and run from the scene. A flight instruction based on this evidence would have been improper because it would not have helped determine whether the defendant committed the offense. "That witnesses who identified appellant as the assaulter also testified that the assaulter fled, did not strengthen their identification. The *assaulter* fled. If appellant was the assaulter then it was appellant who the eyewitnesses saw flee. If appellant was not the assaulter then it was not appellant who the witnesses saw flee." (*Id.*, at p. 851.) Shortly after the assault, however, the defendant was found hiding in a garage, drenched in perspiration, and admitted he had run from the area of the assault; the next morning, the defendant and others loaded up two trucks and moved out of his house. (*Id.*, at p. 845-846.) This evidence of flight *did* warrant a flight instruction, because it was clearly the defendant who was found hiding and his activity could be interpreted as demonstrating a consciousness of guilt, which was relevant to identifying him as the perpetrator of the assault. (*Id.*, at pp. 851-852.) The propriety of a flight instruction

20

"simply depends upon whether the evidence of defendant's flight is logically distinguishable from eyewitness testimony identifying him as the one who perpetrated the offense." (*People v. Rhodes, supra,* 209 Cal.App.3d at p. 1476, fn. 4.)

This is the case here. Martin identified appellant as the person who assaulted and robbed her. Flight from the scene was not relevant to her identification. Sherman and Heckenlaible's identification of appellant as the person they saw fleeing the scene was independently relevant to identifying him as the perpetrator of the offenses against Martin. The instruction did not *require* any conclusion from the jury but only directed the jury that it was permitted to use flight immediately after commission of the crime as evidence of consciousness of guilt *if* it found the defendant fled the scene. And, as has been pointed out elsewhere, the instruction also served to protect appellant, by informing the jury that evidence of flight cannot prove guilt in and of itself. (*People v. London, supra,* 206 Cal.App.3d at p. 904.) " 'The cautionary nature of [consciousness of guilt] instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." [Citations.]'" (*People v. Bolin* (1998) 18 Cal.4th 297, 327, quoting *People v. Jackson* (1996) 13 Cal.4th 1164, 1224.)

Appellant suggests that a flight instruction may be a violation of federal due process if given in a case where the defendant does not have knowledge that he or she is suspected of committing a crime, citing *In re Winship* (1970) 397 U.S. 358, 364, and *County Court of Ulster County v. Allen* (1979) 442 U.S. 140, 157. Neither of these cases address evidence or instructions on flight. *Winship*, of course, clarified that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (397 U.S. at p. 364.) *Allen* made the general point that a permissive presumption "affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." (442 U.S. at p. 157.) As we have explained, that is not the

21

case here, where the evidence of flight could rationally support the inference of consciousness of guilt as it indicated appellant was attempting to distance himself from the area where the offenses occurred.

Of course, to support a flight instruction, the evidence of flight must reflect "a purpose to avoid being observed or arrested." (*People v. Crandell* (1988) 46 Cal.3d 833, 869-870.) In *Crandell*, for example, although the defendant left the house after committing two homicides there, the evidence showed that he left in order to accomplish certain tasks and intended to return to dispose of the bodies, and he was arrested on his way back to the house. (*Ibid.*) Here, the only reasonable inference to be drawn from the evidence was that appellant was leaving the scene to avoid apprehension. And, contrary to appellant's suggestion, we are aware of no case holding that a flight instruction may be given only where there is evidence the defendant attempting to flee when apprehended by the police.[5]

---

[5] For the first time in his reply brief, appellant adds the argument that the cumulative effect of the errors in this case requires reversal. Aside from the improper raising of a new argument in the reply brief, having rejected most if not all of appellant's claims of error, we need not address this contention.

## DISPOSITION

The judgment is affirmed.

                        _____

                        Kline, P.J.

We concur:

_____

Haerle, J.

_____

Richman, J.